Appeal No. 12-2231

UNITED STATES COURT OF APPEALS FOR
THE FIRST CIRCUIT

————————————————————————

UNITED STATES,

Appellee

v.

WILLIAM SCOTT DION

Defendant-Appellant

————————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

————————————————————————

BRIEF FOR DEFENDANT-APPELLANT WILLIAM SCOTT DION

————————————————————————

John M. Goggins
BBO# 631254
Attorney for Defendant
46 Wachusett Street
Worcester, MA 01609
(508) 798-2288
Attorneygoggins.com
john@attorneygoggins.com

i

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION.......................................1

STATEMENT OF ISSUES............................................1

STATEMENT OF THE CASE..........................................2

STATEMENT OF FACTS............................................4

I.   SEARCHES AND SEIZURES.....................................4

     A. 44 DEPOT STREET WARRANT...............................5

     B. 18 WENDY LANE 2003 WARRANT............................9

     C. 18 WENDY LANE 2004 WARRANT...........................10

II.  OFFENSE CONDUCT..........................................13

     A. WILLIAM SCOTT DION ..................................13

     B. THE ALLEGED PAYROLL FRAUD SCHEME.....................15

     C. THE ALLEGED WAREHOUSE BANKING SCHEME.................19

III. CHARLES ADAMS' TESTIMONY................................21

IV.  EFFECT OF THE CLOSING ARGUMENT BY THE GOVERNMENT.........23

V.   DISPARITY IN SENTENCES...................................23

SUMMARY OF ARGUMENT...........................................24

ARGUMENT......................................................27

I.   THE DISTRICT COURT ERRED IN DENYING THE MOTIONS TO SUPPRESS
WHERE THERE WAS NO PROBABLE CAUSE TO BELIEVE THAT A CRIME WAS
BEING COMMITTED AND NO NEXUS BETWEEN THE ALLEGED CRIME AND THE
LOCATIONS SEARCHED............................................27

     A.   Standard of Review................................27

     B.   Legal Standard....................................28

     C.   The 44 Depot Street Warrants......................30

     D.   The 18 Wendy Lane Warrant – 2003..................32

E.   The 18 Wendy Lane Warrant - 2004.....................32

II.  THE DISTRICT COURT ERRED IN DENYING DION'S MOTION TO SEVER
HIS TRIAL FROM THAT OF ADAMS WHERE ADAMS' INFLAMMATORY TESTIMONY
AS AN ADMITTED TAX PROTESTER WAS IRRECONCILABLE WITH DION'S
DEFENSE OF LACK OF INTENT TO DEFRAUD THE IRS...................33

    A.   Standard of Review..................................33

    B.   Legal Standard......................................34

    C.   The District Court Abused Its Discretion in Denying
         Dion's Motion To Sever.............................36

III. THE DISTRICT COURT ERRED IN DENYING DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL WHERE THERE WAS NO EVIDENCE THAT DION
AGREED OR INTENDED TO DEFRAUD THE IRS.........................40

    A.   Standard of Review..................................40

    B.   Legal Standard......................................41

    C.   The Government Failed To Prove Its Case Against
         Dion...............................................42

         1. Dion did not run Contract America or
         Calico Management to evade taxes under the Payroll
         Tax Conspiracy..................................43

             a. Dion did not Conspire in the alleged
             Payroll Conspiracy.........................44

         2. Dion did not agree to run Contract America or
         Calico Management to avoid taxes under the
         Warehouse Banking Scheme........................45

             a. Dion did not Conspire in the alleged
             Warehouse Banking Scheme.................47

         3. Dion did not try to hide his own income.......48

         a. The evidence did not show that Dion
         Obstructed or Impeded the Due
         Administration of the IRS...............49

IV. THE DISTRICT COURT ERRED IN DENYING DION'S MOTION TO DISMISS

FOR LACK OF IMPLEMENTING REGULATIONS...........................50

    A. Standard of Review.....................................50

    B. Legal Standard and Count IV Should Have Been Dismissed by
       the District Court....................................51

V.  THERE WAS AN UNWARRANTED SENTENCING DISPARITY IN THIS
    MATTER................................................53

    A. Standard of Review.....................................53

    B. Legal Standard........................................53

    C. Unwarranted Sentencing Disparity.......................54


CONCLUSION...................................................55

CERTIFICATE OF COMPLIANCE....................................56

CERTIFICATE OF SERVICE.......................................56

TABLE OF CONTENTS TO ADDENDUM

ADDENDUM

**TABLE OF AUTHORITIES**

**CASES**

*California Bankers Association v. Shultz* 416 U.S. 21 (1974)....51

*Dion v. Murphy (Uxbridge postmaster) et al,* 99-CV-40045-NMG
  (D.Mass)..................................................7

*United States v. Benevento,* 836 F.2d 60 (2d Cir.1987)........28

*United States v. Bowers*, 920 F.2d 220 (4th Cir. 1990)..........52

*United States v. Brennick*, 134 F.3d 10 (1st Cir. 1990) .......50

*United States v. Cambara*, 902 F.2d 144 (1st Cir. 1990) .......45

*United States v. De La Paz-Rentas,* 613 F.3d 18 (1st Cir. 2010).33

*United States v. Fenton*, 367 F.3d 14 (1st Cir. 2004)........40-41

*United States v. Fuccillo,* 808 F.2d 173 (1st Cir. 1987) .......29

*United States v. Hicks*, 947 F.2d 1356 (9th Cir. 1991)..........52

*United States v. Gall*, 28 S.Ct. 589 (2007)..................53,54

*United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989).......29

*United States v. Leon,* 468 US 897 (1984)...............8,10,13,29

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008)...........53

*United States v. Medina-Martinez*, 396 F.3d 1 (1st Cir. 2005)...40

*United States v. Mersky*, 361 U.S. 431 (1960)..................51

*United States v. Mubayyid*, 658 F.3d 35 (1st Cir. 2011)........41

*United States v. Ortiz*, 966 F.2d 707 (1st Cir. 1992)..........40

*United States v. Poulin*, 631 F.3d 17 (1st Cir. 2011)..........40

*United States v. Ribeiro,* 397 F.3d 43 (1st Cir. 2005)....27,28,29

*United States v. Richard*, 234 F.3d 763 (1st Cir. 2000) .......40

*United States v. Rios,* 881 F.Supp. 772 (D.Conn.1995)...........29

*United States v. Rodriguez-Reyes,* 11-1013......................41

*United States v. Rosario,* 918 F.Supp. 524 (D.R.I.1996)........29

*United States v. Savarese*, 686 F.3d 1 (1st. Cir. 2012).........30

*United States v. Schultz*, 14 F.3d 109 (6th Cir. 1994) ........28

*United States v. Stokes*, 124 F.3d 39 (1st Cir. 1997), *cert. denied*, 118 S.Ct. 1103 (1998) ..... ..... ..... ..............51

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008).........53

*United States v. Weaver*, 99 F.3d 1372 (6th Cir. 1996) ........30

*Zafiro v. United States*, 506 U.S. 534 (1993) ...........34,35,36

## STATUTES AND RULES

18 U.S.C. §371.............................................1,3,40

18 U.S.C. §3553(a) .......................................53,54

18 U.S.C. §3742(a)...........................................1

26 U.S.C. §7212(a)................................1,3,42,51,52

28 U.S.C. §1291..............................................1

44 U.S.C. §1505.............................................52

Fed R. Crim. P. 12.........................................51

Fed R. Crim. P. 14.........................................34

Fed. R. Crim. P. 29........................................40

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this criminal case by virtue of the indictment of the defendant, William Scott Dion, under 18 U.S.C. §371 and 26 U.S.C. §7212(a). The case was tried to a jury which returned a verdict of guilty on all counts from March 2, 2012 through April 2, 2012. The defendant was sentenced on September 6, 2012 and judgment was entered on the docket on October 2, 2012. On October 11, 2012 the defendant filed a timely notice of appeal.

This Court has jurisdiction over this appeal under 28 U.S.C. §1291 and 18 U.S.C. §3742(a).

## STATEMENT OF THE ISSUES

Whether the District Court erred in denying motions to suppress where there was no probable cause to establish any illegal activity justifying issuance of a warrant and no nexus between the alleged crimes and the locations searched.

Whether the District Court erred in refusing to sever Dion's trial from that of Adams, where Adams was a tax protester who testified at trial and admitted that he intentionally refused to pay taxes and helped other to do the same, the key element denied by Dion.

Whether the District Court erred in ruling that the government had presented sufficient evidence to support a finding of conviction on all counts, where there was no

evidence that Dion intentionally tried to avoid paying income taxes due or helped others to do so.

Whether the District Court erred, when it did not dismiss Count IV of the indictment against Dion because there no implementing regulations were promulgated.

Whether the Dion was subject to an unwarranted sentencing disparity when co-defendants, who were similarly situated to Dion and testified against Dion and accepted responsibility for their actions were given probation and/or 14 months or less than a year in prison and/or were not prosecuted.

### STATEMENT OF THE CASE

On August 12, 2009, William Scott Dion ("Dion") along with his significant other Catherine Floyd ("Floyd"), Charles Adams ("Adams"), Gail Thorick and Myron Thorick were charged by indictment in the United States District Court for the District of Massachusetts with operating tax fraud schemes to assist subscribers to avoid paying payroll taxes and to hide income. Two additional defendants, Gary Alcock and Kenneth Alcock, were indicted as customers of the schemes. (C.A. 14-58).[1]

---

[1] The Consolidated Appendix for Dion and Floyd will be cited as "C.A. XX;" Dion's Addendum to his brief will be cited as "D.A. XX; and Floyd's Addendum to her brief will be cited as "F.A. XX."

Dion was charged with Floyd and Adams in Count One of the indictment alleging a payroll tax fraud conspiracy in violation of 18 U.S.C. §371. (C.A. 21). Dion was indicted with Floyd, Gail Thorick and Myron Thorick in Count Two of the indictment alleging a warehouse banking tax fraud conspiracy in violation of 18 U.S.C. §371. (C.A. 26). Dion was also charged in Count Four of the indictment with corruptly endeavoring to impair and impede the IRS in its collection of taxes due from him, in violation of 26 U.S.C. §7212(a). (C.A. 40).

Prior to trial Dion and Floyd filed motions and a memorandum to suppress evidence obtained pursuant to search warrants executed at Dion's office at 44 Upton Street and at Dion's and Floyd's joint home at 18 Wendy Lane in Uxbridge, MA (D.A. 8, 11). The motions were heard and denied by the district court judge on August 3, 2011. The defendant renewed his objection to the admission of the evidence at trial.[2] (C.A. 245).

Also, prior to trial, Dion moved to dismiss count IV, which alleged that Dion obstructed the IRS in violation of 26 U.S.C. §7212(a) because there appeared to be no Implementing Regulations in Title 26 of the Code of Federal Regulations.

---

[2] The Court ruled that any objection raised by Dion or Floyd would be deemed to be "the objection of one of the defendants to be the objection of all defendants unless context dictates otherwise." AUSA Wild stated that it was his "standard practice [] as well." (C.A. 242, 246).

(C.A. 47, #248).  This motion was denied on September 13, 2011.
Dion requested written findings, which was also denied, on
November 12, 2011. (#280).

Prior to trial Dion moved to sever his trial from that of
Adams on the ground that the parties had inconsistent defenses
which would unfairly prejudice Dion at trial. (D.A. 14) That
motion was denied on September 13, 2011. The motion was renewed
and denied and the objection preserved several times throughout
the trial and after trial.  (C.A. 245, #451).

Dion, Floyd and Adams elected to have a jury trial. Dion
filed Motions for Judgment of Acquittal at the end of the
government's case and within 14 days of the guilty verdicts.
(#444, #451). These motions were denied on March 29, 2012 and
on June 22, 2012, respectfully. The jury returned a verdict of
guilty on all counts as to all defendants on April 2, 2012.
Dion, who had no prior record, was sentenced to 84 months in
prison on September 6, 2012. Judgment was entered on the docket
on October 2, 2012. (D.A. 1). On October 11, 2012, Dion filed a
timely notice of appeal. (D.A. 16). The First Circuit
consolidated Dion's appeal with those of Floyd and Adams for
the purposes of scheduling and oral argument, but the parties
were permitted to file separate briefs.

## STATEMENT OF FACTS

I.   **The Searches and Seizures**

Much of the government's evidence against the defendants used at trial originated from the execution of several search warrants, two at Dion's office at 44 Depot St. and 44 Depot St., #5 (mailbox) in Uxbridge MA (hereinafter "the 44 Depot St. warrants") and two at the home that Dion shared with Floyd at 18 Wendy Lane. The 44 Depot Street warrants and the first 18 Wendy Lane warrant were executed on January 13, 2003. Those search warrants had been obtained by postal inspectors investigating alleged fraud in connection with the sale of novelty identification products that included International Driver's Permits ("IDPs").

The second warrant for 18 Wendy Lane was issued and executed over a year later on March 19, 2004. Unlike the 2003 warrants, the 2004 warrant was obtained by the IRS in connection with an investigation of the tax avoidance schemes alleged in this indictment. Documents taken from the defendant's home in 2003 pursuant to the postal service warrant, however, formed the basis for the IRS's claim of probable cause to issue the 2004 warrant in connection with its investigation of tax avoidance schemes. No charges were ever brought against the defendant or Ms. Floyd in connection with the creation and sale of IDPs.

### A. 44 Depot Street Warrant

The warrants to search the 44 Depot Street office and mailbox were obtained based on an affidavit of Postal Inspector

Faulkerson who alleged that the Postal Service had probable cause to believe that a company called PT Resource Center owned and operated by Dion was falsely claiming that International Driver's Permits it manufactured and sold conformed to certain international conventions governing their manufacture and use. (C.A. 77). Nowhere in the affidavit did Agent Faulkerson state that production or sale of the novelty IDs was illegal in and of itself. Rather, Faulkerson quoted from the company's website claims that the IDPs conformed to international conventions, statements which Faulkerson claimed were false. (C.A. 65-68).

Faulkerson also quoted from the company's website the statements that PT resource Center was a "custom graphics company" (C.A. 65) and the statement that the holographic ID did not conform to the convention. (Id.). Faulkerson did not quote from the company's website any instructions to customers telling them to use the IDs for illegal purposes, as there were no such statements on the website. Rather Faulkerson quoted only a statement that "we use them" for checking into hotels and obtaining travel agent discounts. (C.A. 65-66).

Faulkerson did not in her affidavit quote other statements that were on the website making clear that the company was simply a custom graphics company that produced "novelty IDs" to its customers specifications. Faulkerson also failed to include

6

in her affidavit statements from the website that PT Resource is not responsible for its customers' use or misuse of the cards.

With respect to IDPs in particular, Faulkerson did not in her affidavit quote from the company's website the extended discussion of the convention governing IDPs and the company's position that the American Automobile Association does not have a monopoly on their production. Nor did Faulkerson quote from the company's website statements that IDPs cannot insulate a holder from responsibility for traffic violations or personal or property damage.

Faulkerson alleged that the Postal Service expected to find evidence relating to the IDPs at 44 Depot Street and the affiliated mailbox because the company received mail at that address including IDPs ordered and purchased by undercover agents. Faulkerson also relied upon an affidavit submitted by Dion nearly 4 years earlier in connection with a prior federal district court action. (C.A. 64-65). In his 1999 affidavit, Dion stated that he operated entities at 44 Depot St. and had a personal ownership interest in or managerial responsibility for the businesses. Faulkerson omitted to state in her affidavit that Dion made those assertions in response to claims by the Uxbridge postmaster that he was operating 44 Depot St. as an unregistered Commercial Mail Receiving Agency. *Dion v. Murphy (Uxbridge postmaster) et al,* 99-CV-40045-NMG (D.Mass.

Faulkerson did not inform the court that the postmaster had refused to deliver mail to 44 Depot Street to companies not identified with Dion or his son, including PT Resources, and maintained that position even after receipt of the affidavit. See Declaration of David S. Murphy, par 11, filed 4/5/1999, Document #12, *Dion v. Murphy (Uxbridge postmaster) et al,* 99-CV-40045-NMG (D.Mass).

Dion moved to suppress evidence seized pursuant to the warrants on the grounds that the affidavit establish no probable cause of illegal activity, no nexus between the alleged crimes and the location to be searched and no good faith exception on the part of law enforcement officers. The District Court denied the motion ruling that there was no doubt that IDPs had been bought and produced which according to the District Court established probable cause that a crime was committed. (F.A. 8-9). In addressing the same issue in connection with the first 18 Wendy Lane warrant application, the Court elaborated that it would be equally illegal if the defendants misrepresented the legitimacy of the IDs or if the clients wanted them for illegal purposes. (F.A. 10). The District Court also ruled that the 1999 Dion affidavit established a sufficient nexus between the alleged crimes and the location to be searched and that the warrant met the good faith exception of *United States v. Leon.* (F.A. 9-10).

### B. 18 Wendy Lane 2003 Search Warrant

The 2003 warrant to search Dion's and Floyd's home at 18 Wendy lane was issued based on an affidavit submitted by postal agent Romaniecki which incorporated the Faulkerson affidavit and also alleged probable cause to believe misrepresentations were being made by PT Resource Center in connection with the production and sale of IDPs. (C.A. 87). Romaniecki alleged grounds to believe that evidence would be found at the home based on an interview that day with Mr. Dion at which Mr. Dion admitted that he had a home office at which he did work for PT Resource Center and based on plain view observations of office type equipment at the Dion/Floyd home. (C.A. 87-88).

Dion moved to suppress evidence seized pursuant to the warrant on the grounds that the affidavit established no probable cause of illegal activity, no nexus between the alleged crimes and the location to be searched and no good faith exception on the part of law enforcement. The District Court denied the motion again finding that the production of novelty IDs established probable cause to believe that a crime had been committed. As discussed above, the Court elaborated that it would be equally illegal if the defendants misrepresented the legitimacy of the IDs or if the clients wanted novelty IDs for illegal purposes. (F.A. 10).

9

The District Court also ruled that the 1999 Dion affidavit established a sufficient nexus between the alleged crimes and the location to be searched. The court acknowledged, however, that the home raised a more difficult issue than the office. (F.A. 10). The Court relied heavily on the 1999 affidavit to connect Dion with PT Resource but did not acknowledge the post office's position in the previous case that Dion was just a mail drop and not affiliated with the company (since indeed neither Postal Agent Faulkerson or Romaniecki had told him that). (F.A. 11-13). The court noted that the items in plain view, such as computers and filing cabinets do not imply illegal activity though they are consistent with the kind of business alleged. (F.A. 13-14). The court acknowledged that "[t]he evidence is certainly on the thin side and may be close to the margin of what is necessary to satisfy the nexus requirement,..." but on the whole concluded the that the nexus requirement had been met.(F.A. 14). Again, the court ruled that the warrant also met the good faith exception of *Leon*. (F.A. 16).

### C. 18 Wendy Lane 2004 Search Warrant

The 2004 warrant to search the Dion/Floyd home was attained based not on an affidavit of a postal agent investigating production of IDPs but upon the affidavit of the IRS agent Toy investigating alleged tax avoidance schemes. Agent Toy indicated, however, that the alleged probable cause to believe

that Dion and Floyd were running tax avoidance schemes out of their home was based in substantial part upon documents obtained and items observed in the 2003 search of the home in connection with the postage investigation of the IDPs. (C.A. 97, 102, 110-111, 114-115, 117-118, 128).

In the affidavit, Agent Toy described a payroll service run by a company called Contract America which allowed businesses to pay its workers as independent contractors. (C.A. 98-100). He also described payroll services provided by a company called Talent Management which allowed businesses to pay their workers as W-2 employees. (C.A. 105-106). Toy also described a company called Your Virtual Office which provided bill paying services to small businesses. (C.A. 107-108). Finally the Toy described bank and trust accounts which provided check-cashing and other financial services to its customers. (C.A. 114).

Toy did not allege that any of the services provided or accounts described were in themselves illegal. Nor did Toy assert that any particular client of the businesses wrongly failed to pay taxes. Toy did not assert that the workers paid as independent contractors through Contract America were not actually independent contractors. Toy did not assert that any of the clients of Your Virtual Office or the trust accounts wrongly failed to pay taxes using those services.

Rather to establish probable cause to believe a crime was being committed, specifically tax evasion and the encouragement of others to evade taxes, Toy made the bald assertion that based on his experience these types of arrangements, companies and bank accounts were used in tax avoidance schemes. (C.A. 103-104, 112, 118-121, 123). Toy made similar general allegations with respect to membership in organizations such as Save-A-Patriot. (C.A. 124-125).

Toy also described a telephone call in which he spoke with co-defendant Adams in which Adams asserted that independent contractors would take home 100% of their pay and that therefore Contract America did not take Social Security numbers or make payments to the government. (C.A. 101).

Dion moved to suppress the evidence taken pursuant to the warrant on the ground that it constituted fruits of the illegal 2003 search, that there was no probable cause to believe that any of the companies or accounts were involved in illegal activities, there was no nexus established between any alleged crimes and the home and no good-faith exception should apply. The District Court ruled that the 2003 search was not illegal and therefore was not grounds to suppress the 2004 evidence. (F.A. 16). The District Court also denied the motion apparently accepting Agent Toy's representation that the companies and accounts were of the type used in tax fraud. (F.A. 18-19).

12

The District Court also stated that Dion and Floyd were involved in Save-A-Patriot, "an organization that promotes noncompliance with the tax laws and so on." (F.A. 18-19). The District Court found a sufficient nexus between the alleged tax evasion and the home based on records taken pursuant to the 2003 search warrant, items in plain view during the 2003 search and other items found in the trash. (F.A. 19). The judge rejected any claim of lack of specificity of the warrant on the theory that any evidence of financial activity may be evidence of tax fraud. (F.A. 19). Again, the court ruled that the warrant also met the good faith exception of *Leon*. (F.A. 20).

## II.  THE OFFENSE CONDUCT

### A. William Scott Dion

According to the undisputed evidence of the government's witnesses, Dion operated Business Management Services ("BMS") which provided various services to individual clients and small businesses, such as advising on and creating a corporate structure to affect the client's business plan, estate plan and occasionally assisting in operational issues such as establishing post office boxes and nominee bank accounts. *Passim.* Each client who used nominee services would execute a document that allowed Dion or Floyd to act as a titular head of the business for asset protection purposes. (C.A. 198, 256-257) BMS also assisted clients to set up appropriate trusts and bank

13

accounts for asset protection and estate planning purposes. (See, eg, C.A. 164). BMS provided potential clients a detailed proposal including an estimated cost for the proposed services. (See, eg, C.A. 377-383). Each proposal contained a statement to the effect that BMS were not attorneys or accountants and that the client may want to consult their own attorney or financial advisor. (C.A. 178, 179, 377). BMS charged fees for the various services and the income generated from these fees were reported to the I.R.S in filed tax returns, under a company called "Novawest Solutions, Inc." (See, eg, (C.A.337, 350, 364). BMS also collected money from its clients to pay certain client expenses such as corporate filing fees. (C.A. 174, 175). BMS deposited client fees in escrow accounts that it maintained through other companies, specifically Office Services and later Calico Management. (C.A. 166). The escrow funds held on behalf of BMS by Office Services or Calico Management were commingled with other client funds held by those companies, but detailed accounts were kept as to each client's deposits and withdrawals. (C.A. 181, 182, 185). Deposits into and withdrawals from the Office Services and Calico Management escrow accounts were roughly equal as the client funds were used to pay bills, cash checks etc. (C.A. 184). Deposits to BMS's own accounts totaled approximately $26,000 per year from 1999 to 2007 before deducting for company expenses. (C.A. 186, 187, 188). Although

14

BMS sent out proposals quoting fees of $241,000 according to the BMS files reviewed and summarized by government agents, it sent bills for a total of only $89,000.  (C.A. 117).

The gist of the government's claims against Dion is that he intentionally acted through BMS to encourage and assist its clients to avoid paying payroll taxes or to hide income to avoid paying their own income taxes to the IRS. Specifically, the government alleged that by assisting Marie and Charlie Adams to set up a company called Contract America which provided a payroll service for businesses who paid their workers as independent contractors not subject to withholding or payroll taxes, Dion knowingly and intentionally participated in a conspiracy to deprive the United States of tax revenue from workers who were actually employees subject to withholding. Similarly the government alleged that that by providing services through BMS Dion acted intentionally and in concert with Office Services and Calico to enable their clients such as Gary Alcock and Stephen Savage to hide their income from the IRS through a series of trust and Bank accounts. Finally, the government claimed that Dion used the same strategies and accounts to impede the IRS in collecting taxes due on his own income.

### B. The Alleged Payroll Fraud Scheme

According to the government's witness Marie Jones, formerly and hereinafter "Marie Adams," she and her husband Charlie Adams

established Contract America with clients from another company
American Contracting Services ("ACS") which Marie Adams had
started with an individual named Gordon Phillips. (C.A. 193,
194). She worked with Dion at ACS, who would explained the
software and how to "run" the software. (C.A. 251, 252).
According to Marie Adams, ACS, for a fee, would allow people to
act as private contractors, some of whom did not use their social
security numbers, and be paid by checks, not cash. (C.A. 253).
A similar company called Talent Management was set up to withhold
taxes from employees of clients. (C.A. 254, D.A. 17, 18).
According to Adams, Talent Management was run by Elizabeth
Spellman and she worked for Dion. (C.A. 254, D.A. 18). Contract
America was started as a way for Gordon Phillips to reimburse the
Adamses for losses they sustained in investing in other companies
at Philips' suggestion. (C.A. 193, 194). Mrs. Adams came up with
the name "Contract America" and created the Contract America
brochure. (C.A. 189, 193). Gordon Phillips produced all company
and worker agreements. (C.A. 203). The Adamses owned and ran
Contract America out of their home and Charles Adams was the
facilitator with clients. (C.A. 211, see, eg. C.A. 255).

Marie Adams hired Catherine Floyd at BMS to draft the
corporate documents to set up Contract America. (C.A. 191). At
Marie Adams direction and for a fee, Floyd and BMS obtained PO
boxes and bank accounts for Contract America. (C.A. 204). Marie

Adams also testified that because she had renounced her Social Security number and could not open a checking account, she obtained a Catherine Floyd signature stamp for Contract America through BMS's nominee services. (C.A. 200, 201). BMS also provided estate planning services for the Adamses including trusts for the benefit of their children. (C.A. 198, 199). The trusts were all controlled substantively and funded by the Adamses. *Id*.

According to Marie Adams, neither Dion nor Floyd had any role in running Contract America; Dion and Floyd's role was to create the entity through BMS. (C.A. 202). Dion and Floyd's name were not on client summary sheets. (C.A. 255). Although Marie Adams described Contract America in terms of people "opting out of the tax system," (C.A. 190), the government presented no evidence that she ever discussed that with Dion or Floyd when obtaining services through BMS. In fact, the Contract America service agreement told the client that it was their job to pay any taxes due. (C.A. 192). According to Marie Adams, no taxes and FICA were withheld by Contract America or its clients because the workers were independent contractors who are not subject to withholding. (C.A. 195). All workers signed agreements that they were not employees and worked only as needed. (C.A. 196). All workers were paid by check not cash. (C.A. 197). In fact,

according to government agents, some Contract America workers did report income on tax returns. (C.A. 183).

The government also presented testimony by Gary Alcock and Kenneth Scott Alcock concerning corporate and estate planning services they obtained through BMS. According to Kenneth Alcock, on Dion's advice, his brother Gary restructured his businesses. Under the new structure, truck drivers working for the company would be paid as independent contractors by Contract America while the office workers would be paid as employees through another payroll service run by Mr. Dion called Talent Management. (C.A. 226). According to the Alcocks, the independent contractors were set up through Contract America by Charlie Adams not by Dion or Floyd. (C.A. 227, 228, 229).  According to Gary Alcock, Charlie Adams ran Contract America. (C.A. 230). Moreover, Dion was asked to help Gary Alcock with creditors, including the IRS. (C.A. 266, 275-276, 443).  BMS charged fees for Dion's services, which included business plans and entity setups for Alcock. (C.A. 428).  BMS kept "meticulous" records of all fees and transactions. (C.A. 428).  With Dion's help Gary Alcock was able to get his business plan put into place, operate his business, and minimize his tax exposure without evading taxes. (C.A. 274) Dion assisted Gary Alcock with his creditors and the IRS. (C.A.258-259, 275-276, 440-444).  Dion helped Gary Alcock set up a new entity, Alex Management. (C.A. 256-257, 434-436). By

18

setting up the new entity, Alcock received benefits, by incorporating under Nevada law and lower premiums for worker's compensation. (C.A. 256-257, 433, 434, 436). Under the new company, Alcock's office personnel were billed and used through Talent Management, which withheld taxes and issued proper tax withholding forms. (C.A. 437-438). It is undisputed that Talent Management withheld all taxes and payroll withholdings from employee checks. (C.A. 232, 437-438). Alcock's drivers remained as independent contractors through Contract America and Charlie Adams. (C.A. 255, 278-280, D.A. 19, 45) At some point, Dion and Alcock parted ways. After Dion's departure, Alcock, with Charlie Adams' assistance, paid all of Gary Alcock's workers through Contract America against Dion's advice that the office workers be maintained as W-2 employees. (C.A. 231, 278-279, 281-283).

### C.  The Alleged Warehouse Banking Scheme

The government introduced the testimony of Gail and Myron Thorick concerning the business of Office Services and later Calico Management. Gail Thorick testified that when she first came to work for Office Services she was trained by Dale Christiansen. (C.A. 168). Gail testified she was also trained by Marie Adams. (C.A. 169). Gail testified that she worked under Scott Dion's direction. (C.A. 176). Gail testified that it was written policy that Office Services and its predecessor Your

Virtual Office would comply with all subpoenas for records and in fact that was done. (C.A. 173).

After Office Services closed down, Gail Thorick ran Calico Management out of her home, which was essentially a bill paying, cash checking company. (C.A. 418). It was her business and she had complete control of it. (See, eg. C.A. 395-427). It was not controlled by Dion or Floyd. Id. Gail chose the customers and clients. (C.A. 165, 167, 170, 171). Moreover, BMS was a customer of Calico Mgt, which had an escrow account with Calico, and the monies held by Calico, on behalf of Dion and Floyd were "primarily" for BMS. (C.A. 166, 404, 426-427). Gail moved the office closer to her home in Rhode Island and opened a bank account in Rhode Island. Gail Thorick had signature authority on the Calico Management account, not Floyd or Dion. (C.A. 180). Gail Thorick received all the profits of Calico Management because she owned it. Dion and Floyd did not receive the profits. (C.A. 234). Neither Dion nor Floyd ever told Gail Thorick not to pay taxes. (C.A. 172). Neither Dion nor Floyd ever told Myron Thorick not to pay taxes. (C.A. 233).

Moreover, Stephen Savage testified that he set up a limited partnership through Floyd and BMS to shield assets from creditors, specifically a potential suit by the Iron Workers Union, not to avoid payment of income tax. (C.A. 235). On the contrary, Mr. Savage testified that he asked Floyd how to file

taxes consistent with the corporate structure they had set up but he did not ask her how much to report. (C.A. 236).  Floyd never told him not to file taxes. (C.A. 237).

### III. CHARLES ADAMS' TESTIMONY

Charles Adams was the only one of the three defendants tried together who put on any evidence or who testified. Unlike Dion and Floyd, who argued that the government had failed to prove any intent on their parts to participate in a scheme to avoid payment of income taxes, Adams testified that he set up Contract America based on his belief that citizens of the United States do not have to pay tax on money earned by their labor. (C.A. 218).  He attributed his belief to an organization called Save-A-Patriot ("SAP") and to numerous books and videotapes he had read on the subject. Adams testified that based on the information he had read, he believed that the income tax is voluntary, that the 16th amendment was not properly ratified and that the government improperly uses Federal Reserve money. (C.A. 205).  Adams testified that he believed paper money is forbidden by the Constitution and that he had stopped using banks because he believed that the banking system, starting with the federal reserve, is the oppressor. (C.A. 206, 207). Adams testified that he and his wife had watched SAP videos "over and over" and watched Gordon Phillips videos many times. (C.A. 208, 209).

Based upon these beliefs Adams wrote letters to the government opting out of the Social Security system and resigning from the income tax. (C.A. 212, 213). Adams' frequent correspondence and espousal of his beliefs has earned him a file in the IRS's Frivolous Return Program ("FRP"). (C.A. 239). Adams' correspondence challenging the IRS authorities is FRP advising him of his frivolous position. (C.A. 240).

Adams testified that SAP members contributed to an insurance type fund and to an attorney defense fund to defend members from criminal charges resulting from the positions espoused. (C.A. 210). Adams admitted that SAP members agree to resist tyranny and that SAP gave members scripts to read when responding to the IRS. (C.A. 216, 217) Adams admitted that SAP has been shut down by court order. (C.A. 211). Adams admitted that the author of one of the books he relied upon has been convicted of tax fraud. (C.A. 214). Adams admitted that he disagreed with the District Court judge's instructions in this case. (C.A. 215).

Adams testified that Contract America's documents and brochure reflect his belief that citizens of the United States don't have to pay tax on money earned by their labor. (C.A. 218). The Contract America intake sheet asked if the workers were US citizens working in the US for that reason. (C.A. 219). Adams stated on tape that he had set up Contract America to enable tax protesters not to pay income taxes. (C.A. 220, 221).

**IV.  EFFECT OF THE CLOSING ARGUMENT BY THE GOVERNEMNT**

After, the prejudicial testimony of Charlie Adams in which he essentially admitted guilt to tax evasion and detailed his membership in Save-a-Patriot and the rhetoric used to describe the mentality of its members, who were "defending freedom," the Government was able to argue that that the mental state of Charlie Adams, was essentially the same as possessed by Dion and Floyd. (C.A. 210, C.A. 298). A.U.S.A. Wild, argued in his rebuttal that when Dion and Floyd used disclaimer documents about lawyers and accountants, that they were talking to "members of Save-a-Patriot" who knew their activities were "not legal." (C.A. 298). Wild linked, Charlie Adams' state of mind concerning to "conceal wages" to Dion and Floyd by showing that the same promotional brochure about "taking home 100 percent of your paycheck," was found in the home the Adamses and Dion and Floyd. (C.A. 304). All three Defendants were subsequently convicted of all charges.

**V.  DISPARITY IN SENTENCES**

The co-conspirators, who pled guilty and testified against Dion, received very lenient sentences. Gary Alcock received a 14 month sentence in which his counts were run concurrently. (C.A. 388). Kenneth Alcock received a one year and a day sentence on each count, ran concurrently. (C.A. 390). Myron Thorick received no "term of imprisonment." (C.A. 394). Gail Thorick

received a seven month sentence, ran concurrent with each count. (C.A. 392). Marie Jones was not indicted.

### SUMMARY OF ARGUMENT

The District Court erred in denying the motions to suppress evidence seized from Dion and Floyd's home and the 44 Upton St. office pursuant to the 2003 warrants obtained by the Postal service investigating the sale of allegedly invalid International Driver's Permits ("IDPs"). The District Court also erred in denying the motion to suppress evidence seized from Dion and Floyd's home pursuant to the 2004 warrant obtained by the IRS investigating alleged tax avoidance schemes.

With respect to the 2003 postal service warrants, the District Court erred in finding probable cause to believe a crime had been committed based on the erroneous belief that the mere production and sale of novelty IDs constitutes a crime. Notably no charges were ever brought by the postal agents with respect to the manufacture of IDPs.

The District Court also erred in relying upon Dion's 1999 affidavit to establish a nexus between the alleged crimes and the locations to be searched. The statement was nearly 4 years old and had been made in a prior proceeding in which the Postal Service itself took the position that Dion had no connection to the companies that received mail at 44 Depot St. Thus it was

not a reliable basis for finding a sufficient nexus between Dion and Floyd on the one hand and the companies that received mail at 44 Depot Street on the other.

Without documents taken and observations made by postal agents in the fishing expedition that resulted from issuance of the 2003 warrants, the IRS would not have been able to obtain a warrant in 2004 to search Dion and Floyd's home for evidence of alleged tax avoidance schemes. Furthermore, in refusing to suppress the 2004 IRS warrant, the District Court erred in relying upon the IRS agent's bald assertions that perfectly legal corporations and bank and trust accounts were often used in tax evasion schemes. Such general allegations cannot establish probable cause to believe that Floyd was running a tax evasion scheme out of her home at that time.

The District Court further erred in refusing to sever Dion and Floyd's trial from that of Charlie Adams where their defenses where mutually antagonistic and Adams provided crucial evidence of intent used by the government against Dion which would not have been available at a severed trial. Charlie Adams was the only one of the three defendants who testified or put on any affirmative case. Adams testified that he intentionally established and operated Contract America as a payroll tax fraud scheme to enable other tax protesters like himself to avoid payment of income taxes. That claim was completely

antagonistic to and irreconcilable with Dion's defense. Dion's defense was that he provided services through BMS for clients such as the Adamses and Contract America with no knowledge or intent that they use the legal entities and accounts set up by BMS legally to avoid payment of taxes. Without Charlie Adams' antagonistic defense and testimony at trial and its spillover affect, exploited by the government in its closing argument, the government would never have been able to cast Dion as a tax protester implementing the SAP philosophies through a payroll and bank fraud scheme.

Also, the court erred in denying Dion's motion for judgment of acquittal. The government failed to prove that Dion participated in either of the charged conspiracies or that he tried to hide his own income. The undisputed evidence from the government's own witnesses established that Catherine Floyd had nothing to do with running any of the companies alleged to have perpetrated either the Payroll Tax Conspiracy or the Warehouse banking scheme. Rather Dion ran Business Management Services ("BMS") which advised small businesses and their owners regarding creating corporate and trust entities to implement their business and estate plans. The government presented no evidence that Dion agreed with any of his alleged co-conspirators to run Contract America or Calico Management to assist their clients to avoid taxes. The government adduced no

26

evidence that would support a finding that Dion wrongly sought to hide his own income from taxation.

In addition, the District Court erred when it deny Dion's Motion to Dismiss for Lack of Implementing Regulations. The Government has a legal duty to produce implementing Regulations under 26 CFR. Since the Government cannot demonstrate that there are implementing regulations authorizing the criminal proceeding against Dion under 26 U.S.C. §7212, Dion has been deprived of "due notice" as required by the Fifth Amendment to the United States Constitution.

Finally, there was an unwarranted sentencing disparity between Dion and the co-conspirators. In this matter Dion was sentenced after trial to 84 months, while the co-conspirators received sentences of 14 months or less, probation and/or no criminal prosecution.

<u>**AGRUMENT**</u>

**I.   THE DISTRICT COURT ERRED IN DENYING THE MOTIONS TO SUPPRESS WHERE THERE WAS NO PROBABLE CAUSE TO BELIEVE THAT A CRIME WAS BEING COMMITTED AND NO NEXUS BETWEEN THE ALLEGED CRIMES AND THE LOCATIONS SEARCHED.**

### A. Standard of Review

"In reviewing a denial of a motion to suppress, a court of appeals reviews questions of law *de novo* and factual findings for clear error. ... In reviewing the affidavit

27

supporting an application for a search warrant, we give significant deference to the magistrate judge's initial evaluation, reversing only if we see no "substantial basis" for concluding that probable cause existed." *United States v. Ribeiro,* 397 F.3d 43, 48 (1st Cir. 2005).

### B.  Legal Standard

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed — the `commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched — the so-called `nexus' element." ... In determining whether the nexus element is satisfied, a magistrate has to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." ... Put differently, the application must give someone of "reasonable caution" reason to believe that evidence of a crime will be found at the place to be searched." *Ribeiro,* 397 F.3d at 48-49.

An agent's assertions based upon training and experience may contribute to the probable cause determination but "[a]lone, such generalized observations may not be enough to satisfy the nexus element. *See, e.g., United States v. Schultz,* 14 F.3d 1093, 1097 (6th Cir.1994) (an officer's

28

training and experience "cannot substitute for the lack of evidentiary nexus"); *United States v. Benevento,* 836 F.2d 60, 71 (2d Cir.1987) (agent's expert opinion "standing alone, might not be sufficient to establish a link" between the place searched and the criminal activity), abrogated on other grounds by *United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989); *see also United States v. Rosario,* 918 F.Supp. 524, 528-30 (D.R.I.1996); *United States v. Rios,* 881 F.Supp. 772, 775 (D.Conn.1995)." *Ribeiro*, 397 F.3d at 50-51. For example, in *Ribeiro,* the court determined that "when combined with specific observations about Ribeiro's movements back and forth from his residence in relation to drug transactions, these general observations contribute significantly to the probable-cause determination."

Even where probable cause is lacking, the court may admit the evidence under the good faith exception established in *United States v. Leon,* 468 US 897 (1984). The good faith exception applies where reliance on the warrant is objectively reasonable. *Leon*, 468 U.S. at 922. It does not apply where agents "simply did not take every step that could reasonably be expected of them." *United States v. Fuccillo,* 808 F.2d 173, 178 (1st Cir. 1987). The exception is inapplicable where agents "should have realized that [they] needed to do more

investigative work." *United States v. Weaver,* 99 F.3d 1372, 1380 (6th Cir. 1996).

**C. The 44 Depot Street warrants.**

The District Court erred in denying the motion to suppress with respect to the 44 Depot St. warrants first in ruling that the production of novelty IDs constituted the commission of a crime and second in holding that the 1999 Dion affidavit created a nexus between the alleged crimes and the location to be searched.

First, the Court erred as a matter of law in holding that the production of novelty IDs in and of itself constituted probable cause to believe that a crime had been committed. Notably, Agent Faulkerson did not make that allegation in her affidavit, nor could she have done so. It is not illegal to make fake or novelty IDs or to sell them. *See, e.g., United States v. Savarese*, 686 F.3d 1, 5-6, 10-11 (1st Cir. 2012) (describing how fake/novelty IDs were produced at Dina Ross studio in Boston which was not charged with any crime and continues to operate).

On the contrary, Faulkerson limited her allegation of illegal activity to alleged misrepresentations on the PT Resource website concerning whether the IDPs produced by the company conformed to the international convention. But the District Court judge did not find in ruling on the 44

Depot Street warrant that misrepresentations had been made or that the alleged misrepresentations created sufficient probable cause to believe a crime had been committed and to justify issuance of the warrant. Notably no charges were ever brought concerning the production of novelty or invalid IDPs.

Second, the court erred in relying on the 1999 Dion affidavit to establish a nexus between him and the 44 Depot St. location and postbox, on the one hand, and the alleged illegal production of IDs by PT Resource center, on the other. Indeed the court acknowledged in ruling on the same issue in connection with the first Wendy Lane warrant that the affidavit was possibly stale given that it was nearly 4 years old. (F.A. 12). Indeed Faulkerson neglected to mention in her affidavit that Dion had submitted his affidavit in response to Postal Service allegations that he was operating an unregistered mail drop for unaffiliated parties at the 44 Depot St. location. The ambiguity in the Postal Service's position and the lapse of time since caused the limited affidavit of Dion to be taken out of context. Dion submitted the affidavit, four years earlier in a limited civil context. Thus, no rational fact finder could reasonably rely on Dion's 1999 affidavit to establish a nexus between Dion's office at 44 Depot St. and PT Resources sale of Ids.

31

**D. The 18 Wendy Lane Warrant  - 2003.**

The District Court made the same error here as it had made in connection with the 44 Depot St. warrants in determining that the production of novelty IDs constituted probable cause to believe that a crime had been committed. The court simply failed to understand that the purchasers of the IDs could have wanted them for legitimate purposes and that there was absolutely no evidence that the defendant knew otherwise. On the contrary, the company on its website specifically disclaimed responsibility for improper use of the IDPs, a fact which Faulkerson omitted from her affidavit, and again no charges were ever brought concerning these IDPs.

The District Court again erred in relying on the 1999 affidavit to establish a nexus between the alleged criminal activity and the Dion/Floyd home. Indeed the court itself acknowledged that the home created a more difficult issue and that the items in plain view, computers and filing cabinets, did not necessarily imply illegal activity. The court did not acknowledge that in the prior case the Postal Service had taken the position that Dion was using 44 Depot St. as an unregistered mail drop.

**E. The 18 Wendy Lane Warrant - 2004**

The District Court erred in finding that Agent Toy's warrant affidavit provided sufficient evidence of probable

cause to believe that tax fraud was being committed. Essentially the District Court accepted Agent Toy's representation that in general these sorts of accounts, although perfectly legal in and of themselves, are used to commit tax fraud. Such assertions, standing alone, cannot support a finding of probable cause. See *Ribeiro*, 397 F.3d at 50-51. Nor could the court rely on general statements by the Save-A-Patriot organization to support a finding of probable cause that Floyd was involved in an illegal tax avoidance scheme.

The District Court also erred in finding that there was a nexus between the Dion/Floyd home and the alleged criminal activity. First of all to the extent that the Toy affidavit and the court's ruling are based on documents obtained pursuant to the 2003 search warrant, those documents must be suppressed and cannot form a basis for the 2004 warrant. Moreover the mere presence of certain financial documents in the trash at the house cannot support a finding of nexus to criminal activity where the financial documents do not in and of themselves prove illegal acts.

**II. THE DISTRICT COURT ERRED IN DENYING DION'S MOTION TO SEVER HIS TRIAL FROM THAT OF ADAMS WHERE ADAMS'INFLAMMATORY TESTIMONY AS AN ADMITTED TAX PROTESTER WAS IRRECONCILABLE WITH DION'S DEFENCE OF LACK OF INTENT TO DEFRAUD THE IRS.**

**A. Standard of Review**

"We review a district court's denial of a motion to sever for manifest abuse of discretion, ... and the presumption and common practice favor trying together defendants who are charged with crimes arising out of a common core of facts, ...." *United States v. De La Paz-Rentas,* 613 F.3d 18, 23 (1st Cir. 2010) (internal citation omitted).

**B. Legal standard**

"Rule 14 ... permits a district court to grant a severance of defendants if "it appears that a defendant or the government is prejudiced by a joinder."" *Zafiro v. United States,* 506 U.S. 534, 535 (1993). In *Zafiro,* the Supreme Court "consider[ed] whether Rule 14 requires severance as a matter of law when codefendants present "mutually antagonistic defenses."" *Id.* In so doing, the Court recognized that, "In interpreting Rule 14, the Courts of Appeals frequently have expressed the view that "mutually antagonistic" or "irreconcilable" defenses may be so prejudicial in some circumstances as to mandate severance." *Id.* at 538 (citations omitted).

The Court declined to adopt a *per se* rule, holding instead that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539. The court listed numerous

34

circumstances in which such a risk might occur including when evidence is admitted against a codefendant which would not be admissible if a defendant were tried alone, when defendants have markedly different degrees of culpability and where exculpatory evidence that would be available to a defendant tried alone is unavailable in a joint trial. *Id.* But the court recognized that its list was not exhaustive: "The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here." Id.

While noting that limiting instructions might often cure a risk of prejudice, the court recognized that would not always be the case: "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary ..." *Zafiro,* 506 U.S. at 539.

Under the facts of that case, the Supreme Court ruled that severance was not necessary. *Zafiro,* 506 U.S. At 539-540. In his concurring opinion, however, Justice Stevens noted that, in his view, the defenses in *Zafiro* did not rise to the level of mutual antagonism as neither of the defendants testified and both claimed that the government failed to meet its burden of proof. Neither defendant supplemented the government's evidence against the other. *Zafiro,* 506 U.S. at 542.

## C. The District Court Abused Its Discretion In Denying Dion's Motion To Sever.

The District Court erred in refusing to sever Dion's trial from that of Adams because their defenses where mutually antagonistic and Adams provided crucial evidence of intent used by the government against Dion which would not have been available at a severed trial. Adams was the only one of the three defendants who testified or put on any affirmative case. Compare *Zafiro*, 506 U.S. at 542. Beginning with opening statements and continuing through Adams' testimony, Adams admitted that he intentionally established and operated Contract America as a payroll tax fraud scheme to enable other tax protesters like himself to avoid payment of income taxes. (F.A. 26-32). Adams' attorney stated in her opening that he was proud of his conduct. (F.A. 26-32). Adams' defense was completely antagonistic to and irreconcilable with Dion's defense that he provided services through different entities for clients such as the Adamses and Contract America with no knowledge or intent that they use the legal entities and accounts set up by the entities and BMS illegally to avoid payment of taxes by themselves and others.

Moreover, Adams' testimony and defense were highly prejudicial to Dion because they provided the government essential evidence of intentional wrongdoing in the case. The

36

government began its closing argument by saying that all three defendants were tax protesters and SAP members who ran Contract America, the payroll scheme, and Your Virtual Office, the banking scheme, to fulfill their SAP pledge to impede the IRS. (C.A. 222). That argument was based entirely on Charlie Adams' inflammatory testimony which the government used with a broad brush to ascribe intent to Dion and Floyd. At a severed trial and without Charlie Adams' testimony, the government would never have been able to make that argument.

Throughout the trial there was minimal evidence of any connection between Dion and SAP and certainly nothing as graphic or as riveting as Charlie Adams' testimony. After, the prejudicial testimony of Charlie Adams in which he essentially admitted guilt to tax evasion and detailed his membership in Save-a-Patriot and the rhetoric used to describe the mentality of its members, who were "defending freedom," the Government was able to argue that that the mental state of Charlie Adams, was essentially the same as possessed by Dion and Floyd. (C.A. 210, C.A. 298). A.U.S.A. Wild argued in his rebuttal that when Dion and Floyd used disclaimer documents about lawyers and accountants that they were talking to "members of Save-a-Patriot" who knew their activities were "not legal." (C.A. 298). Wild linked, Charlie Adams' state of mind concerning to "conceal wages" to Dion and Floyd by showing that the same

promotional brochure about "taking home 100 percent of your paycheck," was found in the home the Adamses and Dion and Floyd. (C.A. 304). At a severed trial, this argument would never have been used. Dion maintained his innocence throughout the trial. Indeed, his defense was simply he did nothing illegal and that although the Government did not like his associations with groups like Save-a-Patriot, that he merely provided services to individuals who were outside the system, due to their non-filing tax status. He accounted for the money he earned. There was ample evidence that Dion prepared and filed taxes for others, including Novawest Solutions, Inc. which reported income of BMS. This put Dion in a different position than Adams' who testified about his anti-tax views and his illegal activities. Dion's defense was that his actions were legal and he acted within the scope of the law. The Government used Charlie Adams' testimony to prejudicially discredit Dion's defense.

The government had absolutely no direct evidence that Dion knew anything about the Adamses illegal objectives much less joined them in providing services through BMS. On the contrary, evidence from the government's witnesses was that Dion and Floyd never told anyone not to pay income taxes. In fact, Floyd advised Steven Savage how taxes should be paid based on the corporate structure they had set up. Without Charlie Adams'

testimony and admission of intent, the government would have had to rely solely on the mere existence of the corporations and accounts, all legal, to argue that Dion or Floyd intended to assist others to avoid paying taxes owed and intended to use similar accounts to impede the government in collecting taxes from her.

Indeed, apart from Charlie Adams' live testimony, the only direct evidence of illegal intent cited by the government were statements from the Contract America brochure, drafted by Marie Adams, and a recording of a call by an undercover agent to Contract America's office in which Charlie Adams stated that that Contract America did not file 1099s or W-2 because he did not want support the government and that he (Adams) "was done." (C.A. 223, 224). But given the undisputed evidence that Charlie and Marie Adams ran the day-to-day business of Contract America, the government would have had difficulty in attributing those statements or beliefs to Dion. Without Charlie Adams' antagonistic defense and testimony at trial and its spillover affect, exploited by the government in its closing argument, the government would never have been able to cast Dion as a tax protester implementing the SAP philosophies through a payroll and bank fraud scheme. Without the spillover effect of Charlie Adams' testimony, the government could not have established the necessary intent on the part of Dion to

support a conviction in this case, if indeed it did, which Dion denies. Therefore Dion was entitled to have his trial severed from that of Adams.

### III. THE DISTRICT COURT ERRED IN DENYING DION'S MOTION FOR JUDGMENT OF ACQUITTAL WHERE THERE WAS NO EVIDENCE THAT DION AGREED TO INTENDED TO DEFRAUD THE IRS.

#### A. Standard of Review

Dion challenges the sufficiency of the evidence to support his convictions on Counts I, II, and IV. *See* Fed. R. Crim. P. 29. "We review each challenge de novo, asking "whether any rational fact finder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." *United States v. Medina-Martinez*, 396 F.3d 1, 5 (1st Cir. 2005) (quoting *United States v. Richard*, 234 F.3d 763, 767 (1st Cir. 2000)) (internal quotation marks omitted). "The court's only inquiry is whether the guilty verdict 'is supported by a plausible rendition of the record.'" *United States v. Poulin*, 631 F.3d 17, 22 (1st Cir. 2011) (quoting *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992)). We assume the credibility of all testimony favorable to the government. *See United States v. Fenton*, 367

F.3d 14, 18 (1st Cir. 2004)." *United States v. Rodriguez-Reyes,* 11-1013, April 11, 2013, Lunch, J.

**B. Legal of Review**

The defendants were indicted under 18 U.S.C. §371, which criminalizes conspiracies with an object "to defraud the United States, or any agency thereof in any manner or for any purpose." ... Pursuant to that provision, the government was required to prove three elements: "an agreement, the unlawful objective of the agreement, and an overt act in furtherance of the agreement." ... "The objective of the agreement is unlawful if it is `for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *US v. Mubayyid*, 658 F.3d 35, 52 (1st Cir. 2011)(internal citations omitted).

Count I of the indictment charged that Dion conspired with Floyd, Charlie and Marie Adams to operate a Payroll Tax Conspiracy using the entities Contract America, Talent Management and New Way to assist customers of those companies to avoid paying payroll and withholding taxes for their employees. Count II of the indictment charged that Dion conspired with Floyd, Gail and Myron Thorick to operate a Warehouse Banking Conspiracy using the entities Your Virtual Office/Office Services and Calico Management to assist customers of those companies to hide their income and assets

and avoid paying income taxes due.  Count IV of the indictment
charged that Dion "did corruptly obstruct and impede and
endeavor to obstruct and impede the due administration of the
internal revenue laws of the United States concerning the
ascertainment computation, assessment, and collection of her
federal income taxes" in violation of 26 USC §7212(a).

## C. The Government Failed To Prove Its Case Against Dion.

The government failed to prove that Dion participated in
either of the charged conspiracies or that he tried to hide his
own income. Dion did not work for Contract America or Calico
Management. (C.A. 203, 211, see, eg. C.A. 255, 418). Rather
Dion worked with other entities and Business Management
Services ("BMS") which advised small businesses and their
owners regarding creating corporate and trust entities and
establishing post office boxes and nominee bank accounts to
implement their business and estate plans. (C.A. 166, 202, 404,
426-427). BMS charged a fee for its services. (C.A. 191,
204). It did not take an ownership interest in its clients.
(C.A. 200, 201). In each of its initial proposals, BMS told
its potential clients that they were not attorneys or
accountants and that clients should consult their own attorneys
or financial advisors. (See, eg. C.A. 377, 378).

**1. Dion did not own or run Contract America or Calico Management to evade taxes under the Payroll Tax Conspiracy.**

The undisputed evidence from the government's own witnesses established that Dion had nothing to do with running any of the companies alleged to have perpetrated either the Payroll Tax Conspiracy or the Warehouse banking scheme. First with respect to the alleged Payroll Tax Conspiracy, Marie Adams testified that she and her husband Charlie Adams ran Contract America themselves out of their home by themselves. (C.A. 211, see, eg. C.A. 255). Marie Adams testified that before running Contract America, she had started a company called American Contracting Services with Gordon Phillips. (C.A. 189, 193, 194, 203). Marie Adams testified that Gordon Phillips later helped her to start Contract America as a way to reimburse the Adamses for losses they had sustained from investments made at Philips' suggestion. (C.A.193, 194). Marie Adams testified that she came up with the name of the company and created the brochure. (C.A. 189, 193). She hired BMS to set up the entity and establish a P.O. Box and bank account. (C.A. 191, 204). She also testified that BMS charged Contract America and the Adamses fees for their services. (See, eg. 204). It was clear that neither Dion nor Floyd had anything to do with the ongoing management of the company. Charlie Adams concurred with the Marie's description of the company. (C.A. 220, 221).

Similarly, Gail Thorick testified that she first began working for Office Services where she reported to Mr. Dion. (C.A. 176). She was initially trained by Dale Christiansen and Marie Adams. (C.A. 168). Additionally, Gail Thorick testified that after Office Services closed down, she owned and operated Calico Management. (C.A. 418). Gail moved the office to Rhode Island to be closer to her home and opened a bank account in Rhode Island. Only she had signature authority on that account, not Dion or Floyd. Gail Thorick received all the profits of Calico Management and had complete control of the business including choosing her customers. (C.A. 397, 402, 418). BMS was a customer of Calico Management but Dion and Floyd had nothing to do with running Calico Management's business. (C.A. 397, 402, 403, 418).

### a. Dion did not Conspire in the alleged Payroll Conspiracy.

More specifically, the first count alleged that defendants Dion, Adams and Floyd agreed and conspired to impede the government in its assessment of taxes and that such conspiracy existed through the forming of Contract America, Talent Management and New Way. The evidence of such an agreement was lacking. The evidence showed that Talent Management was managed in such a way in which the proper withholding and payroll taxes were declared and paid to the government. (C.A. 232, 437-438). The evidence, under any and all interpretations of it, indicates that this group was run legally. It was the government theory

44

that this organization always withheld taxes, issued the proper tax forms and had employees who desired to file and pay taxes.

The evidence further showed in the light most favorable to the government that Contract America was the business of defendant Adams and his wife, Marie, an unindicted co-conspirator alone. (C.A. 211, see, eg. C.A. 255). The evidence was clear that the defendants Dion and Floyd had no interest in this business and the operations were solely run by Marie and Charles Adams. Further, there was no evidence that there was an agreement involving Dion and Floyd with Marie and Charles Adams to obstruct the lawful governmental functions of the IRS. Dion and Floyd were operating other businesses unrelated to this one and the evidence of the required agreement is missing.

The government also had to show that the defendant's agreement involved an unlawful objective, that of impeding the IRS. United States v. Cambara, 902 F. 2d 144 (1st Cir. 1990). Such evidence of any agreement which involved an unlawful objective was lacking. The evidence showed that Contract America was the business of the Adams's and they ran it solely. (C.A. 211, see, eg. C.A. 255). Therefore, the evidence of an agreement for an unlawful objective was not sufficient to sustain a conviction and judgment of acquittal should have entered.

**2. Dion did not agree to run Contract America or Calico Management to evade taxes under the Warehouse Banking Scheme.**

45

The government presented no evidence that Dion agreed with any of her alleged co-conspirators to run Contract America or Calico Management to assist their clients to avoid taxes. At most, the Government established that Dion set up banking and payroll plans to allow people who could not get bank accounts to transact business, minimize their tax responsibility, and protect their assets through the use of nominee trust services that Dion and Floyd provided. Most significantly, neither Marie Adams nor Gail and Myron Thorick testified that Dion or Floyd had any agreement to illegally evade taxes. Gail Thorick and Myron Thorick both testified that neither Dion nor Floyd ever told them not to pay taxes. (C.A. 172, 233). Stephen Savage, a BMS client testified that he asked Catherine Floyd how to file taxes consistent with the corporate structure they had set up and she never told him not to file taxes. (C.A. 237).

Nor did the government introduce documents to suggest that Dion had agreed to be part of the charged conspiracies. Contract America's service agreement informed its customers that it was their job to pay any taxes due. All workers paid through Contract America signed an agreement stating that they were not employees and that they work as needed. (C.A. 196). Workers were paid by check. (C.A. 197, 253). Government witnesses testified that some Contract America workers did report their income on their tax returns. (C.A. 183). Indeed,

46

Dion assisted Gary Alcock in working with the IRS to resolve Alcock's issues with the IRS. (C.A. 258-259, 275-276, 440-444).

On the contrary, the government adduced affirmative evidence that it was the Adams's and their clients who sought to avoid payment of taxes due. Contract America clients Gary and Scott Alcock testified that Dion advised them to pay their office workers through Talent Management, which paid workers on a W-2 basis and withheld all payroll taxes due. The Alcocks followed Mr. Dion's advice for a time but later, when Dion was no longer their advisor, paid all of their office workers through Contract America, with the help of Charlie Adams and not Dion. (C.A. 231, 278-279, 281-283). The Alcocks testified that it was Charlie Adams, not Dion, who set up their workers through Contact America. (C.A. 255, 278-280, D.A. 19).

### a. Dion did not Conspire in the alleged Warehouse Banking Conspiracy.

More specifically, in Count II, the evidence was insufficient to sustain a conviction. The allegations in this count were that the defendants Dion and Floyd conspired with the Thoricks to form YVO, Office Services and Calico to defraud the United States by obstructing the lawful governmental functions of the IRS.

The evidence presented at trial demonstrated that Calico, one of the alleged businesses in the conspiracy was operated solely by the Thoricks and not by either defendant Dion or Floyd. (See, eg. 395-427). Further, there was insufficient

evidence presented that either Dion or Floyd were involved in the daily operation of Calico Enterprises. Gail Thorick testified that she alone decided which customers to take in and that it was always her desire to decrease the customers that governed the operational pattern. (C.A. 165, 167, 170, 171). Finally, Gail Thorick testified that in all circumstances did her customers withhold, file, and pay the appropriate federal taxes.  Additionally there was no evidence presented of an agreement between Dion and Floyd and the Thoricks to form Calico Enterprises for the purpose of impeding the IRS. The evidence shows that Calico was the business of Gail Thorick and she ran it solely and she testified that on all occasions did her employees withheld and file properly.  Therefore, the evidence of an unlawful objective was not sufficient to sustain a conviction on this basis alone and a judgment of acquittal should have entered.

### 3. Dion did not try to hide his own income.

The government adduced no evidence that would support a finding that Dion wrongly sought to hide his own income from taxation. Neither Dion nor Floyd were charged with failing to file a return. More importantly the government adduced no evidence that either Dion or Floyd earned enough to pay taxes during the period. Government agents admitted that bank deposits for BMS were not all income to the company but included expenses to be paid on behalf of its clients. Agents

acknowledged that although BMS quoted some $241,000 in proposed invoices they sent bills of only $89,000 during the period examined by the agents. (C.A. 117). Indeed agents admitted that total deposits to the BMS account during the years in question were approximately $26,000 per year before expenses. Most importantly, BMS income was disclosed to the IRS through Novawest tax returns. Therefore there is little likelihood much less proof beyond a reasonable doubt that Dion owed taxes for the period in question.

In the end, the Government relies solely on the structure of bank accounts and business entities to argue that Dion corruptly impeded the IRS's tax collection function. All of the accounts in question, however, were perfectly legal and without more do not support a finding that a crime was committed.

### a. The evidence did not show that Dion Obstructed or Impeded the Due Administration of the IRS.

More specifically with respect to Count IV, the evidence failed to prove that Mr. Dion did willfully impaired and impeded the IRS in administering their duties as it applied to himself. There was no evidence presented that Mr. Dion earned the requisite amount of taxable income required to pay taxes or file a return. The evidence showed that Dion did not thwart the IRS, the documentation presented in this case consisted of numerous banking transactions, checks, entity agreements and was

voluminous and open for IRS to examine. For the tax periods involved, there was no evidence presented that the IRS ever audited Dion, ever told him that what he was doing was wrong, ever told him that he should be paying something. In conjunction with this, therefore, in the appropriate tax periods, there was no evidence presented that Dion ignored the IRS; that he failed to cooperate with the IRS, that he failed to correspond when requested, or that he failed to present documents when requested.

The evidence presented did show that BMS charged fees for their business operations. The evidence did not show that BMS's earnings were greater than their expenses, nor did it show that Mr. Dion personally made sufficient income required to either file or pay federal income taxes. Furthermore, the evidence showed that all of BMS income was reported as BMS Trust on the Novawest tax returns. Based on the foregoing, a judgment of acquittal should have entered.

### IV. THE DISTRICT COURT ERRED IN DENYING DION'S MOTION TO DISMISS FOR LACK OF IMPLEMENTING REGULATIONS.

#### A. Standard of Review

A reviewing court will afford little or no deference on a motion to dismiss that raises "abstract issues of law." *United States v. Brennick*, 134 F. 3d 10, 13-14 (1st Cir. 1998). This court exercises a "plenary review" when there is "pure question

of law." *U.S. v. Stokes*, 124 F.3d 39, 42 (1st Cir.)*, cert. denied*, 118 S.Ct. 1103 (1997).

### B. Legal Standard and Count IV Should Have Been Dismissed by the District Court.

Dion moved before trial to dismiss Count IV of the indictment, that charged him with obstructing the IRS in violation of 26 U.S.C. §7212(a). See, Fed. R. Crim. P. 12(b)(3)(A) (Defendant must raise a "motion alleging a defect in instituting the prosecution" before trial). This indictment was deficient as a matter of law because there appears to be no Implementing Regulations in Title 26 of the Code of Federal Regulations giving effect to 7212(a). The absence of Implementing Regulations is just as important as the existence of Implementing Regulations. California Bankers Association v. Shultz, 416 U.S. 21, 26 (1974); United States v. Mersky, 361 U.S. 431 (1960). In Bankers Association the Supreme Court stated that "the Act's civil and criminal penalties attach only upon violation of the regulation promulgated by the Secretary: if the Secretary were to do nothing, the Act itself would impose no penalties on anyone." *Id*. The reporting act "is not self-executing" and thus, the act can impose no duties until implementing regulations have been promulgated. *Id*. at 64.

In essence 26 U.S.C. §7212 is an enforcement statute which adversely affects Dion's rights and prescribes a penalty.

Therefore, the enforcement of these sections would meet the requirement for having "general applicability and legal affect" as prescribed above in 44 U.S.C. §1505(a)(1) of the Federal Register Act, and therefore, implementing Regulations are required to be published in both the Federal Register and codified in title 26 of the Code of Federal Regulations.

The Parallel Table of Authorities and Rules for the CFR contain no Implementing Regulations published in the Federal Register for 26 U.S.C. §7212 in the CFR's for Title 26. Thus, this section may not be enforced against members of the general public because no implementing Regulations were published in the Federal Register and codified in 26 CFR and required by 44 U.S.C. §1505(a)(1).

Despite, that other Circuits have ruled against dismissing indictments through lack of publication requirements[3], the Government had a legal duty to publish Implementing Regulations under 26 CFR which authorizes this enforcement action under 26 U.S.C. §7212 in order to meet the Constitutional requirement for "due process" and "due notice." Since the government did not demonstrate that there were implementing regulations authorizing

---

[3] See, *United States v. Hicks*, 947 F.2d 1356, 1359 (9th Cir. 1991)( lack of display of OMB control numbers does not vitiate a criminal prosecution under 26 U.S.C. §7203). Also, *United States v. Bowers*, 920 F.2d 220, 221-23 (4th Cir. 1990)(Affirmed conviction for tax evasion despite failure to publish in Federal Register).

this proceeding, the government cannot prosecute this case because defendant has have been deprived of due notice as required by the Fifth Amendment to the United States Constitution. Therefore, the District Court erred when it denied Dion's motion to dismiss.

**V. THERE WAS AN UNWARRNATED SENTENCING DISPARITY IN THIS MATTER.**

    **A. Standard of Review**

Thes court must satisfy itself that the sentence imposed is "substantive[ly] reasonable[]." *United States v. Gall*, 28 S.Ct. 589, 597 (2007). Moreover, the Court's "review for substantive reasonableness amounts to a review for an abuse of discretion." United States v. Thurston, 544 F.3d 22, 25 (1st Cir. 2008). The review requires that this Court "tak[e] into account the totality of the circumstances." *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008).

    **B. Legal Standard**

The sentencing decisions of lower courts should "generally be respected." *Thurston*, 544 F.3d at 25. The reason for this respect is that sentencing judges are in a "superior position" to apply the 18 U.S.C. §3553(a) factors. *Gall*, at 597. One of the factors that must be considered by a sentencing judge, is to "avoid unwarranted sentence disparities among defendants, with

similar records who have been found guilty of similar conduct."
See, *Gall*, at 598; 18 U.S.C. §3553(a)(6).

### C. Unwarranted Sentencing Disparity

Here the sentencing judge abused his discretion when he sentenced Dion to 84 months, which caused the judge to run Dion's sentences consecutively.[4]  Essentially, Dion, Floyd, the Thoricks, the Adamses and the Alcocks were similarly situation in that no one had any significant criminal record. It appears that the people who went to trial were given a significantly more harsh sentence than those who did not.  For example Dion received 84 months of incarceration, Floyd 60 months and Charlie Adams 48 months. (D.A. 2, F.A. 2, C.A. 85). Marie Adams for her cooperation was not prosecuted.  Gail and Myron Thorick, who in the light most favorable to the Government ran the same type of businesses the Dion was involved with earlier. Yet Gail was sentenced to seven months and Myron received no incarceration.  (C.A. 392, 394).  Gary Alcock received a 14 month sentence.  (C.A. 388).  Kenneth Alcock, who according to testimony had been avoid filing of tax returns since 1990, was sentenced to 12 months and a day.  (C.A. 390).

Dion recognizes that the sentencing judge has wide latitude in fashioning a sentence.  However, on September 6,

---

[4] Counts I and II have a maximum imprisonment of five years, and Count IV has a maximum of three years of imprisonment.

2012, Dion was the first to be sentenced and he received the longest period of incarceration. When the judge sentenced Dion, he could not have known what the likely sentences for the other similarly situation co-defendants that he would give.   Dion also recognizes that the judge found that he was a leader/organizer the co-defendant. However, the judge precluded cross examination of Marie Jones on the basis of a possibility of a consecutive sentences because "consecutive sentences" in tax cases are "a highly remote possibility and may confuse the jury." (C.A. 248).   Therefore, give the totality of the circumstances that trial judge abused his discretion when he gave Dion a consecutive sentence and as a result an unwarranted sentencing disparity has occurred and Mr. Dion should be resentenced.

## CONCLUSION

For the foregoing reasons, the judgment should be vacated.


Respectfully Submitted,
William Scott Dion,
By his attorney,

 /s/ John M. Goggins
John M. Goggins (BBO# 631254)
46 Wachusett Street
Worcester, MA 01609
attorneygoggins.com
(508) 798-2288

Date:    June 18, 2013

**CERTIFICATE OF COMPLIANCE**

I, John M. Goggins, hereby certify that Microsoft Word 2010 was used to produce this brief and that this using its word count function, this brief (excluding table of authorities, table of contents, certificate of compliance and certificate of service) contains 55 pages and 12,290 words, and this brief has been prepared in a mono spaced type using 12 point Courier New.


 /s/ John M. Goggins
John M. Goggins


**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2013 the above document was served on all parties of record by ECF filing.


 /s/ John M. Goggins
 John M. Goggins

Appeal No. 12-2231


UNITED STATES COURT OF APPEALS FOR
THE FIRST CIRCUIT

————————————————————————


UNITED STATES,

Appellee


v.


WILLIAM SCOTT DION

Defendant-Appellant

————————————————————————


ADDENDUM TABLE OF CONTENTS

1. Judgment (#526)                                      D.Add.1

2. Motion to Suppress 18 Wendy Lane 1/13/03 search
   (#196)                                               D.Add.8

3. Motion to Suppress 18 Wendy Lane 3/19/04 search
   (#197)                                               D.Add.11

4. Motion to Sever (#236)                               D.Add.14

5. Dion Notice of Appeal (#533)                         D.Add.16

6. Marie Jones (#598)                                   D.Add.17

7. Gary Alcock (#600)                                   D.Add.19

8. Motion to Dismiss Lack of Implementing CFR
   (#248)                                               D.Add.22

Case 4:09-cr-40027-FDS   Document 526   Filed 10/02/12   Page 1 of 10

✎AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
                    Sheet 1 - D. Massachusetts - 10/05

# UNITED STATES DISTRICT COURT
## District of Massachusetts

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **V.** | |
| **WILLIAM SCOTT DION** | Case Number: **4: 09 CR 40027 - 001 - FDS** |

USM Number: 804-19038

JOHN GOGGINS

Defendant's Attorney

☐ Additional documents attached

☐

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 4
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:          Additional Counts - See continuation page ☐

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 USC § 371 | CONSPIRACY (CLASS D) | 09/2004 | 1 |
| 18 USC § 371 | CONSPIRACY (CLASS D) | 12/2005 | 2 |
| 26 USC § 7212(a) | Corruptly Endeavoring to Obstruct & Impede the Due Admin. of the Internal Revenue Laws(Class E) | 08/2007 | 4 |

The defendant is sentenced as provided in pages 2 through ____10____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

09/06/12

Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV

Signature of Judge

The Honorable F. Dennis Saylor IV

Judge, U.S. District Court

Name and Title of Judge

10/02/2012

Date

✎AO 245B(05-MA)      (Rev. 06/05) Judgment in a Criminal Case
                     Sheet 2 - D. Massachusetts - 10/05

DEFENDANT:   **WILLIAM SCOTT DION**                     Judgment — Page ___2___ of ___10___
CASE NUMBER: **4: 09  CR  40027   - 001 - FDS**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:     84      month(s)

60 months on counts 1 and 2 to run concurrently.
24 months on count 4 to run consecutive to counts 1 and 2

☑ The court makes the following recommendations to the Bureau of Prisons:

That defendant serve the sentence at a BOP facility close to Worcester, MA.
Court recommends substance abuse screening.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m.   on _____.

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☑ before 2 p.m. on ___10/04/12___.

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Case 4:09-cr-40027-FDS   Document 526   Filed 10/02/12   Page 3 of 10

🖎AO 245B(05-MA)      (Rev. 06/05) Judgment in a Criminal Case
                      Sheet 3 - D. Massachusetts - 10/05

| | Judgment—Page    3    of    10 |
|---|---|

DEFENDANT:    **WILLIAM SCOTT DION**        ✚
CASE NUMBER:  **4: 09  CR  40027   - 001 - FDS**

## SUPERVISED RELEASE                    ☑ **See continuation page**

Upon release from imprisonment, the defendant shall be on supervised release for a term of :        36    month(s)

36 months on counts one & two. 12 months on count four. All terms to run concurrently

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed  104   tests per year, as directed by the probation officer.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B(05-MA)    Case 4:09-cr-40027-FDS    Document 526    Filed 10/02/12    Page 4 of 10
(Rev. 06/05) Judgment in a Criminal Case
Sheet 4A - Continuation Page - Supervised Release/Probation -10/05

DEFENDANT:    **WILLIAM SCOTT DION**                    Judgment—Page ___4___ of ___10___
CASE NUMBER:    **4: 09 CR 40027   - 001 - FDS**

## ADDITIONAL ☑ SUPERVISED RELEASE ☐ PROBATION TERMS

1. The defendant is to pay the balance of any fine or restitution imposed according to a Court-ordered repayment schedule.

2. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without the approval of the probation office while any financial obligations remain outstanding.

3. The defendant is to provide the probation office access to any requested financial information, which may be shared with the financial litigation unit of the U.S. Attorney's Office.

4. The defendant is to meet with the Internal Revenue Service within the first 45 days of the period of supervision in order to determine the prior tax liability, and it is to file tax returns and pay any past or future taxes due.

## Continuation of Conditions of ☑ Supervised Release ☐ Probation

5. The defendant is to participate in a program for substance abuse counseling as directed by the United States Probation Office, which program may include testing, not to exceed 104 drug tests per year, to determine whether the defendant has reverted to the use of alcohol or drugs. The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third party payment.

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
Sheet 5 - D. Massachusetts - 10/05

| | | |
|---|---|---|
| DEFENDANT: | **WILLIAM SCOTT DION** | Judgment — Page __5__ of __10__ |
| CASE NUMBER: | **4: 09  CR  40027   - 001 - FDS** | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $        $300.00 | $ | $        $3,000,000.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| IRS-RACS | $3,000,000.00 | $3,000,000.00 | 100 |
| ATTN: Mail Stop 6261, Restitu | | | |
| 333 West Pershing Ave | | | |
| Kansas City, MO 64108 | | | |

☐ See Continuation Page

| | | |
|---|---|---|
| **TOTALS** | $        $3,000,000.00 | $        $3,000,000.00 |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B(05-MA)
(Rev. 06/05) Judgment in a Criminal Case
Sheet 6 - D. Massachusetts - 10/05

Case 4:09-cr-40027-FDS   Document 526   Filed 10/02/12   Page 6 of 10

| | Judgment — Page | 6 | of | 10 |

DEFENDANT:    **WILLIAM SCOTT DION**
CASE NUMBER: **4: 09 CR 40027  - 001 - FDS**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**   [X] Lump sum payment of $ $300.00   due immediately, balance due

       [ ] not later than _____, or
       [ ] in accordance [ ] C,   [ ] D,   [ ] E, or   [ ] F below; or

**B**   [ ] Payment to begin immediately (may be combined with [ ] C,   [ ] D, or   [ ] F below); or

**C**   [ ] Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   [ ] Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
       _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
       term of supervision; or

**E**   [ ] Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   [X] Special instructions regarding the payment of criminal monetary penalties:

       Payment of the restitution shall begin immediately and shall be made according to the requirements of the
       Federal Bureau of Prisons' Inmate Financial Responsibility Program while the defendant is incarcerated and
       according to a Court-ordered repayment schedule during the term of supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[X] Joint and Several
                                                                          [ ] See Continuation
                                                                                   Page

       Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
       and corresponding payee, if appropriate.

       Restitution of $3,000,000.00 shall be paid jointly and severally with co-defendants, any other persons, who have been
       convicted of the instant offense who is, or may be, ordered to pay restitution in Criminal No. 4:09-cr-40027-FDS (D.
       Mass).

[ ] The defendant shall pay the cost of prosecution.

[ ] The defendant shall pay the following court cost(s):

[ ] The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B ( 05-MA) (Rev. 06/05) Criminal Judgment
Attachment (Page 4) — Statement of Reasons - D. Massachusetts - 10/05

Case 4:09-cr-40027-FDS  Document 526  Filed 10/02/12  Page 10 of 10

| | | Judgment — Page | 10 | of | 10 |
|---|---|---|---|---|---|

DEFENDANT:     **WILLIAM SCOTT DION**
CASE NUMBER:   **4: 09 CR 40027  - 001 - FDS**
DISTRICT:       **MASSACHUSETTS**

Defendant's Soc. Sec. No.:    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

Defendant's Date of Birth:    1959

Defendant's Residence Address:   Sanbornville, NH 03872

Defendant's Mailing Address:      Same as above

Date of Imposition of Judgment
09/06/12

/s/ F. Dennis Saylor, IV

Signature of Judge
The Honorable F. Dennis Saylor IV        Judge, U.S. District

Name and Title of Judge
Date Signed    10/02/2012

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,)          CRIMINAL ACTION
    PLAINTIFF        )          NO. 09-cr-40027-FDS
                    )
Vs.                  )
                    )
WILLIAM SCOTT DION,    )
    DEFENDANT        )

## **MOTION TO SUPPRESS EVIDENCE**

Defendant, William Scott Dion, respectfully moves, pursuant to the Fourth Amendment of the United States Constitution and Fed. R. Crim. P. 12, to suppress the fruits of the searches of his residence at 18 Wendy Way, Uxbridge, Massachusetts and office space at 44 Depot Street and 44 Depot Street, #5, Uxbridge, Massachusetts, including but not limited to a gateway desktop computer, a combination lock safe and its contents, copy machine, a gray 20-drawer filing cabinet, a manila envelope containing cash, documents, photographs, production equipment and supplies, billing records, invoices, correspondence, financial records, mailing envelopes, driving permits and materials regarding various websites and all fruits thereof, on William Scott Dion, by members of the United States Postal Service and any other Government agents, executed on or about January 13, 2003. As grounds for this motion, Defendant states that the warrants for the searches were not supported by probable cause, the search warrants were unreasonable, Defendant did not consent to the

searches of the various premises, the search warrants procedures violated defendant's rights under the Fourth and Fourteenth Amendments to the United States Constitution, the evidence seized exceeded the scope of the search warrants, and that furthermore the good faith exception as stated in United States v. Leon, 468 U.S. 897 (1984) is inapplicable.  See, e.g., United States v. Fuccillo, 808 F.2d 173, 178 (1st Cir. 1987).  All evidence flowing from the illegal searches must be suppressed.  See Wong Sun v. United States, 371 U.S. 471 (1963).

In support of this motion, Defendant relies upon the attached memorandum of law and exhibits which include the various search warrants, applications and affidavits of Robert P. Romaniecki in support of each search warrant and attached exhibits.

WHEREFORE, Defendant, William Scott Dion, states that the aforesaid evidence was obtained in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  The Defendant further requests the Court to set an evidentiary hearing on the foregoing motion and upon hearing, enter an order suppressing all evidence obtained against William Scott Dion, either Directly or indirectly as a result of the seizure of items seized at the aforementioned locations for the reasons set forth herein and on any other additional grounds that may be adduced at hearing.

WILLIAM SCOTT DION
By his attorney,


/s/ John M. Goggins
John M. Goggins
46 Wachusett Street
Worcester, MA 01609
Tel. 508.798.2288
B.B.O. #631254

Dated:  May 11, 2011


CERTIFICATE OF SERVICE


I, John M. Goggins, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 11, 2011.


/s/ John M. Goggins
John M. Goggins

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,)          CRIMINAL ACTION
     PLAINTIFF        )              NO. 09-cr-40027-FDS
                      )
Vs.                   )
                      )
WILLIAM SCOTT DION,   )
     DEFENDANT        )
```

## MOTION TO SUPPRESS EVIDENCE

Defendant, William Scott Dion, respectfully moves, pursuant to the Fourth Amendment of the United States Constitution and Fed. R. Crim. P. 12, to suppress the fruits of the search of his residence at 18 Wendy Way, Uxbridge, Massachusetts, all items, evidence seized and all fruits thereof, on William Scott Dion, by members of the Internal Revenue Service and any other Government agents, executed on or about March 19, 2004.  As grounds for this motion, Defendant states that the warrants for the search was not supported by probable cause, the search warrant was unreasonable, Defendant did not consent to the search of 18 Wendy Ways, the search warrant procedures violated defendant's rights under the Fourth and Fourteenth Amendments to the United States Constitution, the evidence seized exceeded the scope of the search warrants, and that furthermore the good faith exception as stated in United States v. Leon, 468 U.S. 897 (1984) is inapplicable.  See, e.g., United States v. Fuccillo, 808 F.2d 173, 178 (1st Cir. 1987).  All evidence flowing from the illegal searches

—1—

must be suppressed.   See Wong Sun v. United States, 371 U.S. 471 (1963).

In support of this motion, Defendant relies upon the attached memorandum of law and exhibits which include the search warrant, applications and affidavits of David Toy in support of the search warrant and attached exhibit(s).

WHEREFORE, Defendant, William Scott Dion, states that the aforesaid evidence was obtained in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  The Defendant further requests the Court to set an evidentiary hearing on the foregoing motion and upon hearing, enter an order suppressing all evidence obtained against William Scott Dion, either Directly or indirectly as a result of the seizure of items seized at the aforementioned location for the reasons set forth herein and on any other additional grounds that may be adduced at hearing.


                                WILLIAM SCOTT DION
                                By his attorney,


                                /s/ John M. Goggins
                                John M. Goggins
                                46 Wachusett Street
                                Worcester, MA 01609
                                Tel. 508.798.2288
                                B.B.O. #631254

Dated:  May 11, 2011

CERTIFICATE OF SERVICE

I, John M. Goggins, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 11, 2011.

/s/ John M. Goggins
John M. Goggins

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,)          CRIMINAL ACTION
      PLAINTIFF        )          NO. 09-cr-40027-FDS
                       )
Vs.                    )
                       )
WILLIAM SCOTT DION,    )
      DEFENDANT        )
```

<u>DEFENDANT'S MOTION FOR SEVERANCE</u>

NOW COMES Defendant William Scott Dion, by and through his attorney, and pursuant to Fed. R. Crim. P. 14 and 12(b)(5) does hereby respectfully request that his matter be severed from all co-defendants in this matter and that he be tried separately.

Defendant further states that joinder of all defendants in this matter will prejudice him.  As grounds therefore, Defendant states the following:

1. Irreconcilable differences exist between Defendant and the various co-defendants in this matter. See <u>Zafiro v. United States</u>, 506 U.S. 534 (1993).  Some of the defendants may attempt to blame Defendant for their predicament and Defendant intends to vigorously assert that he is not responsible of the actions of co-defendants. Furthermore, when the evidence against one co-defendant is <u>de minimis</u> compared to evidence against other defendants, a severance is warranted. <u>United States v. Mardian</u>, 546 F.2d 973, 980-81 (D.C. Cir. 1976); <u>United States v. Sampol</u>, 636 F.2d 621, 645-47 (D.C. Cir. 1980).

2. A joint trial will preclude Defendant from obtaining exculpatory evidence from other co-defendants who will assert their 5th amendment privilege against compulsory self-incrimination should they be called to testify.  It is believed that other defendants in this matter would testify that Defendant, William Scott Dion, never encouraged co-defendants to avoid paying federal income taxes.

3. The prosecution in this case will use statements made by co-defendants Charles Adams and others to implicate Defendant William Scott Dion in the alleged conspiracy. Notwithstanding that the government may contend that this

D.Add.14

Case 4:09-cr-40027-FDS   Document 236   Filed 07/23/11   Page 2 of 2

evidence may be probative of Defendant's guilt, however, it will also produce a risk undue prejudice to him.    See <u>Bruton v. United States</u>, 391 U.S. 123, (1968).

Defendant asserts that these grounds demonstrate a strong showing of undue and severe prejudice.    See, <u>Zafiro v. United States</u>, 506 U.S. at 539; United States v. Boyd, 180 F.3d 967, 982, 8th Circuit, (1999)(severe prejudice must be shown).

Wherefore, for all of the above, Defendant respectfully requests a hearing on this matter and that this Honorable Court allow the instant motion.

Respectfully Submitted,

William Scott Dion,

By His Attorney,


/s/__John M. Goggins__

John M. Goggins

46 Wachusett Street

Worcester, MA  01609

Tel:  508. 798. 2288

BBO #631254

Dated: July 23, 2011


## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to all counsel of record on this 23nd day of July, 2011.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,)              CRIMINAL ACTION
    PLAINTIFF     )              NO. 09-cr-40027-FDS
               )
Vs.             )
               ) **NOTICE OF APPEAL**
WILLIAM SCOTT DION,    )
    DEFENDANT     )

NOW comes the Defendant, William Scott Dion, in the above captioned case, with the Honorable F. Dennis Saylor, IV presiding being aggrieved by certain decisions, opinions, rulings, directions and judgments rendered on divers occasions hereby appeals to the First Circuit pursuant to Rules 3 & 4 of the Federal Rules of Appellate Procedure.

The Defendant is appealing the denial of all pretrial and trial oral or written motions and rulings, including but not limited to the Motion to Sever, Motion to Dismiss, all Motions to Suppress, and the Motion to Dismiss for Lack of Implementing CFR for 26 U.S.C. 7212 by Judge F. Dennis Saylor. In addition, Defendant is appealing the sentence issued by Judge F. Dennis Saylor on or about September 6, 2012 and the judgment issued by Judge F. Dennis Saylor on or about October 2, 2012, and, all other pretrial motions written and oral, all issues of fact and law during the Trial, including but not limited to the decisions of the Defendant's Motions pursuant to Fed. R. Crim. P. Rule 33 and Rule 29, sentencing, restitution order, judgment and any and all other issues raised during the proceedings of this matter.

Respectfully submitted,
William Scott Dion,

```
 1      Q.  How did you become familiar with something called
 2  Talent Management?
 3      A.  Scott told me about it.
 4      Q.  What did Scott tell you about Talent Management?
 5      A.  Talent Management was designed to work
 6  hand-in-hand with American Contracting Services.  People
 7  who believed that they were not liable for the income
 8  tax could work through American Contracting Services.
 9  People who wanted to participate in the voluntary tax,
10  having Social Security withheld and having taxes
11  withheld, they could work through Talent Management.
12      Q.  And do you -- did you learn from anybody who had
13  formed Talent Management?
14                  MR. BLACK:  Objection.
15                  THE COURT:  Sustained in that form.
16  BY MR. WILD:
17      Q.  Did you have discussions with Defendant Dion
18  about Talent Management?
19      A.  A few, yes.
20      Q.  Did he tell you at any time how the Talent
21  Management was formed?
22      A.  I -- I don't recall specific conversations about
23  how it was formed.  I -- we discussed why it existed.
24      Q.  What did he tell you about why it existed?
25      A.  To work hand-in-hand with American Contracting
```

```
 1   using "employees," Judge, and so I object to the

 2   characterization --

 3            THE COURT:  I'll let the jury decide for

 4   themselves if there's any difference in that.

 5            Go ahead, Mr. Wild.

 6            MR. WILD:  Thank you, your Honor.

 7   BY MR. WILD:

 8     Q.  Did you learn about someone named Elizabeth

 9   Spellman?

10     A.  Yes.

11     Q.  Who is Elizabeth Spellman?

12     A.  She was the person who was running Talent

13   Management.

14     Q.  What does that mean, from your knowledge, she was

15   running Talent Management?  What did she do?

16     A.  Well, she would do the same sort of thing that I

17   was doing on the American Contracting Services side and

18   whatever else, whatever other government reporting

19   needed to be done, withholding taxes, et cetera, she

20   would handle that on the Talent Management side.

21     Q.  And who did she work for?

22     A.  Scott Dion.

23     Q.  Where was Talent Management located?

24     A.  Elizabeth Spellman ran it, and I believe she was

25   located in Uxbridge.
```

1    setting up Alex Management?

2        A.   Correct.

3        Q.   So when you testified earlier about meeting

4    Catherine Floyd, what you really meant was Dale

5    Christiansen?

6        A.   No.

7                MR. KANE:  Objection.

8                THE COURT:  Sustained.  Sustained.

9    BY MR. GOGGINS:

10       Q.   Did you deal with Contract America?

11       A.   Personally?

12       Q.   Yeah.

13       A.   Yes.

14       Q.   Okay.  And who was your contact person at

15   Contract American?  Was it Charlie Adams?

16       A.   Yes.

17       Q.   So when you were setting up employees with

18   Contract America, Charlie Adams would take all of that;

19   correct?

20       A.   Yes.

21       Q.   Charlie Adams would go with all the

22   employ -- would sign up the people who -- the workers

23   that were coming to him?

24       A.   Yes.

25       Q.   Okay.  Scott didn't sign up the workers with

```
 1      A.  Yes.
 2      Q.  And he's listed as an excavator operator;
 3  correct?
 4      A.  Yes.
 5      Q.  And if we could go to 48.  This is for Craig
 6  Cutler?
 7      A.  Yes.
 8      Q.  And he is listed as a mechanic?
 9      A.  Yes.
10      Q.  And if we could just go to the next page, 49.
11  Down at the bottom, that's Craig's signature with a date
12  of 11/26/01?
13      A.  Yes.
14      Q.  And one more, page 50.  And what I'm showing you
15  here is Paul Norton; correct?
16      A.  Yes.
17      Q.  And he's listed as a truck driver?
18      A.  Yes.
19      Q.  And the date on that is 11/9/01?
20      A.  Yes.
21      Q.  Okay.  Why don't you take that down.
22          So all the ones that -- and those were
23  people that were put into America Contract; right?
24      A.  Contract America.
25      Q.  Contract America?
```

1      A.   Yes.

2      Q.   They were put into it, and those people would

3   report their hours; correct?

4      A.   Yes.

5      Q.   They would get a paycheck, wouldn't they?

6      A.   Yes.

7      Q.   They wouldn't be paid cash under the table or

8   anything like that?

9      A.   Correct.

10      Q.   So every time one of those workers got paid, they

11   got a check that they negotiated someplace assumedly?

12      A.   Correct.

13      Q.   Now, you and your brother met with BMS, Scott --

14      A.   And Catherine.

15      Q.   -- and Catherine at this point to talk about a --

16   essentially a business asset management plan; is that

17   correct?

18      A.   Yes.

19      Q.   And your brother had a lot of issues at this

20   point?

21      A.   Yes.

22      Q.   He had creditors?

23      A.   Yes.

24      Q.   He had IRS --

25      A.   Yes.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 09-CR-40027 |
| v. | ) | |
| | ) | |
| CATHERINE FLOYD, | ) | |
| WILLIAM DION, | ) | |
| Defendants | ) | |

### JOINT MOTION TO DISMISS/LACK OF IMPLEMENTING CFR FOR 26 U.S.C. Sec. 7212 AND MEMO IN SUPPORT OF MOTION

Pursuant to Fed. R. Crim. P. 12, defendants Catherine Floyd and William Dion move to dismiss Counts IV and V of the above entitled indictment for reasons stated below. Counts IV and Count V charges the defendants William Dion and Catherine Floyd with obstructing the IRS in violation of 26 U.S.C. Section 7212(a) respectively.

These indictments must be dismissed as 26 U.S.C. Section 7212 is deficient under the law as there appears to be no Implementing Regulations in Title 26 of the CFR's giving force and effect to this statute.

It is the defendant's contention that the absence of Implementing Regulations is just as important as the existence of Implementing Regulations. California Bankers Association v. Shultz, 416 U.S. 21, 25 (1974); U.S. v. Mersky, 361 U.S. 431 (1960). In Bankers Association the Supreme Court has said that "the Act's civil and criminal penalties attach only upon violation of the regulation promulgated by the Secretary: if the Secretary were to do nothing, the Act itself would impose no penalties on anyone.

…the reporting act is not self-executing; it can impose no duties until implementing regulations have been promulgated. Id.

The defendants contend that the 26 U.S.C. 7212 is an enforcement statute which adversely affects the rights of the alleged defendants and which prescribe a penalty. Therefore, the enforcement of these sections would meet the requirement for having "general applicability and legal affect" as prescribed above in 44 U.S.C. Section 1505(a)(1) of the Federal Register Act, and therefore, implementing Regulations are required to be published in both the Federal Register and codified in title 26 of the Code of Federal Regulations.

The defendants further contend that in the Parallel Table of Authorities and Rules that there are no Implementing Regulations published in the Federal Register for 26 U.S.C. 7212 in the CFR's for Title 26. The conclusion therefore, is that this section may not be enforced against members of the general public because no implementing Regulations were published in the Federal Register and codified in 26 CFR and required by 44 U.S.C. Section 15059a)(1).

It appears that the only Implementing Regulations for 26 U.S.C. 7212 are published in Title 27 of the Code of Federal Regulations and not title 26 of the CFR. See 27 CFR 40.1 et seq., 41.1, et seq. , 44.1 et seq., 45.1 et seq.,  and 46.1 et seq. These regulations specifically apply only to agents of the Alcohol and Tobacco Tax and Trade Bureau and not to the Internal Revenue Service.  Specifically 1 CFR Sec. 21.21(c) states that one federal agency may not cite as their authority, regulations promulgated by another federal agency. Therefore it is the defendant's contention that the IRS may not

cite regulations published in 17 CFR by the Alcohol and Tobacco Tax and Trade Bureau as their authority for any enforcement action under 26 CFR.

The Government had and still has a legal duty to produce Implementing Regulations under 26 CFR and not 27 CFR which authorizes this enforcement action under 26 U.S.C. 7212 in order to meet the Constitutional requirement for "due process" and "due notice". Since the government cannot demonstrate that there are no implementing regulations authorizing this proceeding, the government cannot prosecute this case because both defendants have been deprived of due notice as required by the Fifth Amendment to the United States Constitution. Therefore, this case must be dismissed as a matter of law.

Respectfully submitted,
CATHERINE FLOYD

By:    /s/ Alan J. Black
       ALAN JAY BLACK, Her Attorney
       1383 Main Street
       Springfield, MA 01103
       (413) 732-5381
       BBO#553768

Respectfully Submitted,
WILLIAM SCOTT DION

By: /s/ John Goggins
JOHN GOGGINS, His Attorney
46 Wachusett Street, 2nd Floor
Worcester, MA  01609
(508) 471-3597
BBO# 631254