Appeal No. 12-2231


UNITED STATES COURT OF APPEALS FOR
THE FIRST CIRCUIT

_____


UNITED STATES,

Appellee


v.


WILLIAM SCOTT DION

Defendant-Appellant

_____



ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS



_____


REPLY BRIEF FOR DEFENDANT-APPELLANT WILLIAM SCOTT DION



_____



John M. Goggins
BBO# 631254
Attorney for Defendant
46 Wachusett Street
Worcester, MA 01609
(508) 798-2288
Attorneygoggins.com
john@attorneygoggins.com

# TABLE OF CONTENTS

ARGUMENT....................................................1

    **I.**   THE LACK OF SUFFICENT EVIDENCE TO CONVICT DION COUPLED WITH ADAMS' TESTIMONY RESULTED IN SEVERE PREJUDICE THAT MANDATES A NEW TRIAL...................................1

        a. Lack of Evidence in Alleged Payroll Conspiracy......2

        b. Lack of Evidence in Alleged Warehouse-Banking.......4

        c. Lack of Evidence that Dion Endeavored to Obstruct The IRS...........................................6

        d. Denial of Dion's Motion for Severance Resulted In Severe Prejudice.................................7

   **II.**  THE DISTRICT COURT ERRED IN DENYING THE MOTIONS TO SUPPRESS........................................13

  **III.** THE DISTRICT COURT ERRED IN DENYING DION'S MOTION TO DISMISS FOR LACK OF IMPLEMENTING REGULATIONS.......14

   **IV.** THERE WAS AN UNWEARRANTED SENTENCING DISPARITY.......14

CONCLUSION.................................................16

CERTIFICATE OF COMPLIANCE.................................17

CERTIFICATE OF SERVICE....................................17

**TABLE OF AUTHORITIES**

**CASES**

Krulewitch v. United States, 336, U.S. 440 (1949).............8

United States v. Rose, 104 F.3d 1408 (1st Cir. 1997)...........9

Zafiro v. United States, 506 U.S. 534 (1993) ...............8,10

**STATUTES**

26 U.S.C. §7212(a)..........................................14

**ARGUMENT**

**I.   THE LACK OF SUFFCENT EVIDENCE TO CONVICT DION COUPLED WITH ADAMS' TESTIMONY RESULTED IN SEVERE PREJUDICE THAT MANDATES A NEW TRIAL.**

The Government's hubristic claim that there was "overwhelming evidence [to] support[] the jury's verdict determining that Floyd and Dion conspired to Defraud the United States through the payroll scheme . . . through the promotion of a warehouse-banking scheme. . . [and that they] corruptly endeavor[ed] to obstruct and impede the IRS' ability to determine their individual income and taxes" falls far short of reality.  (G.Br. 30, 35,39-41)[1].

**a. Lack of Evidence in Alleged Payroll Conspiracy.**

Here, the Government failed to prove that Dion participated in either of the charged conspiracies or that he tried to hide his own income. Dion did not work for Contract America or Calico Management, entities associated with the alleged Payroll and Banking Warehouse schemes. (C.A. 203, 211, see, eg. C.A. 255, 418). Rather, Dion worked with other entities, and Business Management Services ("BMS"), which advised small businesses and their owners regarding creating corporate and trust entities and establishing post office

---

[1]   The Government's Brief will be cited as "G.Br. XX;" the Consolidated Appendix for Dion and Floyd as "C.A. XX;" Dion's Addendum to his brief as "D.A. XX;" Floyd's Addendum to her brief as "F.A. XX;" and the Government's Supplemental Appendix as "Supp. App. XX."

boxes and nominee bank accounts to implement their business and estate plans. (C.A. 166, 202, 404, 426-427). BMS charged a fee for its services. (C.A. 191, 204). It did not take an ownership interest in its clients businesses. (C.A. 200, 201). In each of its initial proposals, BMS told its potential clients that they were not attorneys or accountants and clients should consult their own attorneys or financial advisors. (See, eg. C.A. 377, 378).

Moreover, the undisputed evidence from the Government's own witnesses established that Dion had nothing to do with running any of the companies alleged to have perpetrated either the Payroll Tax Conspiracy or the Warehouse banking scheme. First, with respect to the alleged Payroll Tax Conspiracy, Marie Adams testified that she and her husband Charlie Adams ran Contract America themselves out of their home. (C.A. 211, see, eg. C.A. 255). Marie Adams testified that before running Contract America, she had started a company called American Contracting Services with Gordon Phillips. (C.A. 189, 193, 194, 203). Marie Adams testified that Gordon Phillips later helped her start Contract America as a way to reimburse the Adamses for losses they had sustained from investments made at Philips' suggestion. (C.A.193, 194). Marie Adams testified that she came up with the name of the company and created the brochure. (C.A. 189,

193).  She hired BMS to set up the entity and establish a P.O. Box and bank account.  (C.A. 191, 204).  She also testified that BMS charged Contract America and the Adamses fees for their services.  (See, eg. C.A. 204).  It was clear that neither Dion nor Floyd had anything to do with the ongoing management of the company. Charlie Adams concurred with the Marie's description of the company. (C.A. 220, 221).

Similarly, Gail Thorick testified that she first began working for Office Services where she reported to Mr. Dion. (C.A. 176).  She was initially trained by Dale Christiansen and Marie Adams.  (C.A. 168). Additionally, Gail Thorick testified that after Office Services closed down, she owned and operated Calico Management. (C.A. 418). Gail moved the office to Rhode Island to be closer to her home and opened a bank account in Rhode Island. Only she had signature authority on that account, not Dion or Floyd. Gail Thorick received all the profits of Calico Management and had complete control of the business including choosing her customers.  (C.A. 397, 402, 418). BMS was a customer of Calico Management but Dion and Floyd had nothing to do with running Calico Management's business. (C.A. 397, 402, 403, 418).

Furthermore, evidence of a conspiracy in the alleged payroll scheme was lacking. The evidence showed that Talent Management was managed properly and all withholding and payroll

taxes were declared and paid to the Government. (C.A. 232, 437-438).

### b. Lack of Evidence in Alleged Warehouse-Banking.

The Government and defense established that Dion set up banking and payroll plans to allow people who could not get bank accounts to transact business, minimize their tax responsibility, and protect their assets through the use of nominee trust services that Dion and Floyd provided. The Government states that Your Virtual Office (YVO) was one of a "series of front companies . . . that served no legitimate purpose." (G.Br. 17-18). This simply was not born out by the evidence presented to the jury. The evidence the Government produced, which included the YVO agreement, demonstrated that YVO was a legitimate business. (Supp. App. 26-28). YVO provided check cashing, bill paying and an asset protection service for clients that were concerned about privacy. (Supp. App. 26-27). Most importantly YVO warned clients "NOT [to] attempt to involve Your Virtual Office in any fraudulent or illegal activities or schemes . . . [and YVO] WILL cooperate with properly designated law enforcement authorities." (Supp. App. 28). Other evidence showed that BMS notified clients that they were not "attorneys, accountants, nor CPA's" and that the clients may consult with their "own attorney or financial

experts." (See eg. C.A. 377, 378). These are not the hallmark of a business that serves "no legitimate purpose." (G.Br. 18). Rather, this is one example of how legitimate business services can be interpreted by the Government as illegal activity and demonstrates the weakness and lack of evidence on behalf of the Government.

In addition, it was the Adams's and their clients who sought to avoid payment of taxes due. Scott Alcock testified that he used the checking services and paid a fee for the services. Contract America client, Gary Alcock, testified that Dion advised him to pay their office workers through Talent Management, which paid workers on a W-2 basis and withheld all payroll taxes due. Alcock followed Dion's advice for a time but later, when Dion was no longer their advisor, paid all of their office workers through Contract America, with the help of Charlie Adams and not Dion. (C.A. 231, 278-279, 281-283). The Alcocks testified that it was Charlie Adams, not Dion, who set up their workers through Contact America. (C.A. 255, 278-280, D.A. 19).

The Government asserts that Dion and Floyd's motive for obstructing the IRS was that the BMS's business was "highly lucrative." (G.Br. 19). Yet this is clearly untrue when one looks at the payments to BMS from Contract America from 2001 to 2004. (Supp. App. 121-122). According to the Government's

exhibit, Contact America paid BMS a total of $32,468.60 over a four year period, hardly "highly lucrative." (Supp. App. 121-122; G.Br. 19).

The Government also contends that because YVO advertised in the Save-a-Patriot Fellowship newsletter, that Dion and Floyd were "recruiting" tax defiers.  (G.Br. 36-37; Supp. App. 56). However, on the same page of the advertisement is an ad for "Sterling Silver Liberty Pins, Pendants and Cufflinks." (Supp. App. 56).  This is proof that just because an advertiser places an ad in a so-called anti-tax magazine, it does not mean the advertiser shares the same sentiment towards the Government that the magazine editors or subscribers do.  Moreover, YVO and BMS sought to get clients who needed services for check cashing and business entity solutions.   Therefore, the Government either lacked the specific evidence to support its theory of the case or, at the very least, had a weak case and a judgment of acquittal should have entered.

### c. Lack of Evidence that Dion Endeavored to Obstruct The IRS.

The Government adduced no evidence that would support a finding that Dion wrongly sought to hide his own income from taxation. Dion was not charged with failing to file a return. More importantly, the Government produced no evidence that either Dion or Floyd earned enough to pay taxes during the

6

period. Government agents admitted that bank deposits for BMS were not all income to the company but included expenses to be paid on behalf of its clients. Agents acknowledged that although BMS quoted some $241,000 in proposed invoices they sent bills of only $89,000 during the period examined by the agents. (C.A. 117). Indeed agents admitted that total deposits to the BMS account during the years in question were approximately $26,000 per year before expenses. Most importantly, BMS income was disclosed to the IRS through Novawest tax returns. (C.A. 337, 342, 350, 357, 364, 373).

The Government relied solely on the structure of bank accounts and business entities to argue that Dion corruptly impeded the IRS's tax collection function. All of the accounts in question, however, were perfectly legal and without more do not support a finding that a crime was committed. Furthermore, the evidence showed that all of BMS income was reported as BMS Trust on the Novawest tax returns. (C.A. 337, 342, 350, 357, 364, 373). Based on the foregoing, there was a significant lack of evidence concerning the conspiracy indictments and the impeding indictment.

### d. Denial of Dion's Motion for Severance Resulted In Severe Prejudice.

Because of the above, Dion contends that there was insufficient evidence to warrant the convictions or a tenuous

case against him at best and that he was severely prejudiced by the joinder of his case with Adams. "Rule 14 ... permits . . . severance of defendants if 'it appears that a defendant or the government is prejudiced by a joinder.'" Zafiro v. United States, 506 U.S. 534, 535 (1993). Severance should occur when "mutually antagonistic" or "irreconcilable" defenses [are] so prejudicial in some circumstances as to mandate severance." Id. at 538 (citations omitted). "And in all cases, the Court should be mindful of the serious risks of prejudice and overreaching that are [particularly] characteristic of joint [conspiracy] trials." Id. at 545 (Stevens, J., concurring). See also, Krulewitch v. United States, 336 U.S. 440, 454, 457 (1949)(Jackson, J., concurring)(Recognizing jurors, in co-defendant conspiracy cases, may be too "ready to believe that birds of a feather are flocked together" and that when prejudice results, it is "regrettable" that "reversal" is mandated).

This was not a case that was a slam dunk for the Government. It was a case that was tried very tightly by defense counsel for Dion and Floyd, with a very specific argument that Dion and Floyd were business people, using lawful activities to run a lawful business and the fact that there were some unsavory people who endeavored to misuse their business advice does not warrant a conviction for tax fraud.

8

Moreover, this is not a case of mere antagonistic defenses. This is a case where one defendant, Charlie Adams, pleaded guilty in front of jury and the Government used his guilty plea to wrongfully convict Dion and Floyd.

The Government wrongfully relies on <u>United States v. Rose</u>, for the proposition that the "fact that various defendants offered different or conflicting defenses is insufficient to mandate severance." (G.Br. 56). In <u>Rose</u>, the trial judge denied a motion to sever because the court "had no basis prior to trial for concluding that the codefendants had inconsistent defenses." <u>United States v. Rose</u>, 104 F. 3d 1408, 1415 (1st Cir. 1997). The trial judge has "a continuing duty at all stages of the trial to grant a severance if prejudice [] appear[ed]." <u>Id</u>. (citation omitted). Here, the judge had ample evidence of not only conflicting defenses, but rather highly antagonistic defenses. Dion and Floyd moved pre-trial and several times throughout, the trial, for severance. The opening statements of counsel in which Dion and Floyd suggested legal and valid businesses versus Adams' opening that he did not believe that he owed taxes. The course of the trial in which Dion and Floyd extensively and rather tightly cross-examined the Government's witnesses to establish that these operations were legitimate businesses which maintained corporate formalities and were not alter egos of Charlie Adams or other tax defiers. The judge had

9

ample and extensive opportunity to know the case and its tenor, but at no time did he engage in any significant analysis of severance and routinely and summarily denied the multiple motions for severance.

The prejudice continued because the District Court's lack of inquiry and summary denials of requests for severance. The failure of the District Court to grant severance caused great prejudice to Dion and Floyd and deprived them of their only defense to the indictment. The prosecution in this case, well aware of the conflicting defenses, used Adams' guilty plea to its advantage and linked Floyd and Dion to Adams' guilty mind.

The District Court erred in refusing to sever Dion's trial from that of Adams because their defenses where mutually antagonistic and Adams provided crucial evidence of intent used by the Government against Dion which would not have been available at a severed trial. Adams was the only one of the three defendants who testified or put on any affirmative case. Compare <u>Zafiro</u>, 506 U.S. at 542. Beginning with opening statements and continuing through Adams' testimony, Adams admitted that he intentionally established and operated Contract America as a payroll tax fraud scheme to enable other tax protesters like himself to avoid payment of income taxes. (F.A. 26-32). Adams' attorney stated in her opening that he was proud of his conduct. (F.A. 26-32). Adams' defense was

completely antagonistic to and irreconcilable with Dion's defense. Adams stated that he did not pay taxes because he believed that he did not owe taxes. Dion's defense was that he provided services through BMS for clients, such as the Adamses and Contract America, with no knowledge or intent that the clients used BMS to illegally to avoid payment of taxes.

Moreover, Adams' testimony and defense were highly prejudicial to Dion because they provided the Government essential evidence of intentional wrongdoing in the case. The Government began its closing argument by saying that all three defendants were tax protesters and SAP members who ran Contract America, the payroll scheme, and Your Virtual Office, the banking scheme, to fulfill their SAP pledge to impede the IRS. (C.A. 222). That argument was based entirely on Charlie Adams' inflammatory testimony which the government used with a broad brush to ascribe intent to Dion and Floyd. At a severed trial, without Charlie Adams' testimony, the Government would never have been able to make that argument. There was no instruction that cured this prejudice.

Throughout the trial there was minimal evidence of any connection between Dion and SAP. Charlie Adams testimony was prejudicial. Adams, who essentially pleaded guilty to tax evasion, detailed his membership in Save-a-Patriot and the rhetoric used to describe the mentality of its members, who

were "defending freedom." Adams' testimony gave the Government
the ability to argue that that the mental state of Adams, was
the same mental state possessed by Dion and Floyd. (C.A. 210,
C.A. 298). A.U.S.A. Wild argued in his rebuttal that when Dion
and Floyd used disclaimer documents about lawyers and
accountants that they were talking to "members of Save-a-
Patriot" who knew their activities were "not legal." (C.A.
298). Wild linked Adams' intent to "conceal wages" to Dion and
Floyd by showing that the same promotional brochure about
"taking home 100 percent of your paycheck," was found in the
home the Adamses and Dion and Floyd. (C.A. 304). At a severed
trial, this argument could never have been used.

Dion maintained his innocence throughout the trial.
Indeed, his defense was simply he did nothing illegal and that,
although the Government did not like his associations with
groups like Save-a-Patriot, he merely provided services to
individuals who were outside the system, due to their non-
filing tax status. Dion accounted for the money he earned.
There was ample evidence that Dion prepared and filed taxes for
others, including Novawest Solutions, Inc. which reported
income of BMS. (C.A. 337, 342, 350, 357, 364, 373). This put
Dion in a different position than Adams' who testified about
his anti-tax views and his illegal activities. The Government

used Adams' testimony to prejudicially discredit Dion's defense.

The Government had no direct evidence that Dion knew anything about the Adamses illegal objectives much less joined them by providing services through BMS. On the contrary, evidence from the Government's witnesses was that Dion and Floyd never told anyone not to pay income taxes. Without Charlie Adams' testimony and admission of guilt/intent, the Government would have had to rely solely on the mere existence of the corporations and accounts, all legal, to argue that Dion or Floyd intended to assist others to avoid paying taxes owed and intended to use similar accounts to impede the Government in collecting taxes from him. Therefore, denial of the severance motions caused Dion to suffer severely prejudicial impact that no jury instruction cured.

## II. THE DISTRICT COURT ERRED IN DENYING THE MOTIONS TO SUPPRESS.

Dion agrees and adopts as if fully stated herein Floyd's response in her reply brief sections VI and VII concerning the denial of the motions to suppress. In addition, the Government makes as false assertion that "PT Resources" was in fact "defendants" company. (G.Br. 43). At no time during the pendency of the case did the government prove or allege that

13

PT Resources was Dion or Floyd's company. The evidence was that PT Resources was owned by another individual, Don Glessner, and that BMS merely provided some limited business services.

### III. THE DISTRICT COURT ERRED IN DENYING DION'S MOTION TO DISMISS FOR LACK OF IMPLEMENTING REGULATIONS.

Dion is unaware of any case in this circuit which has addressed, specifically, the lack of implementing regulations concerning 27 U.S.C. §7212(a). Dion relies on his argument raised in his opening brief. But notes that the Government did not cite any authority that would suggest that because §7212(a) predates the publication requirements of §1505(a) that it follows that Congress has to intend to vacate prior criminal statutes. The Government misses the point. The lack of implementing regulations suggests to Dion, as he reads and understands the cases cited in his opening brief, that §7212(a) should not apply to him. Dion is not trying to undermine any prior convictions. Rather, his conviction should be vacated because the Government had a legal duty to publish implementing regulations in order to meet the Constitutional requirement for "due process" and "due notice." Therefore, the District Court erred when it denied Dion's motion to dismiss.

### IV.   THERE WAS AN UNWEARRANTED SENTENCING DISPARITY.

The Government contends that because the trial judge departed significantly from the United States Sentencing Guidelines, that he was given "considerable leniency." (G.Br. 60). Dion's argument is not that he is "dissatisfied" with the departure from the Guidelines, it is merely that he was sentenced more harshly relative to the other co-defendants and tax-evaders in general. (G.Br. 61). Essentially, Dion, Floyd, the Thoricks, the Adamses and the Alcocks were similarly situated, in that no one had any significant criminal record. The people who went to trial were given significantly more harsh sentences than those who did not.

Moreover, the judge precluded cross examination of Marie Adams-Jones on the basis of a possibility of a consecutive sentences because "consecutive sentences" in tax cases are "a highly remote possibility and may confuse the jury." (C.A. 248). Therefore, given the totality of the circumstances Dion received an unwarranted sentencing disparity and Dion should be resentenced.

**CONCLUSION**

For the foregoing reasons, and those set forth in Dion's opening brief, the judgment should be vacated.


Respectfully Submitted,
William Scott Dion,
By his attorney,


/s/ John M. Goggins
John M. Goggins
BBO# 631254
46 Wachusett Street
Worcester, MA 01609
www.attorneygoggins.com
P. (508) 798-2288
F. (508) 798-5572
E. john@attorneygoggins.com


Date:    October 9, 2013

16

<u>**CERTIFICATE OF COMPLIANCE**</u>

      I, John M. Goggins, hereby certify that Microsoft Word 2010 was used to produce this brief and that this using its word count function, this brief (excluding table of authorities, table of contents, certificate of compliance and certificate of service) contains 16 pages and 3,275 words, and this brief has been prepared in a mono spaced type using 12 point Courier New.

 /s/ John M. Goggins    
John M. Goggins

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on October 9, 2013 the above document was served on all parties of record by ECF filing.

 /s/ John M. Goggins    
 John M. Goggins